UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

PLUMBERS AND STEAMFITTERS LOCAL :    Civil Action No.
137 PENSION FUND, Individually and on :
Behalf of All Others Similarly Situated, :    COMPLAINT FOR VIOLATIONS OF THE
                                   :    FEDERAL SECURITIES LAWS
              Plaintiff, :
                                     :
      vs. :
                                     :    <u>DEMAND FOR JURY TRIAL</u>
AMERICAN EXPRESS COMPANY, :
KENNETH I. CHENAULT and JEFFREY C. :
CAMPBELL, :
                                     :
             Defendants. :

————————————————————— x

Plaintiff Plumbers and Steamfitters Local 137 Pension Fund ("Plaintiff"), on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by the American Express Company ("AmEx" or the "Company"), as well as conference call transcripts and media and analyst reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all purchasers of AmEx common stock between October 16, 2014 and February 11, 2015, inclusive (the "Class Period") seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2.     Defendant AmEx, together with its subsidiaries, provides charge and credit payment card products and travel-related services to consumers and businesses worldwide. AmEx obtains revenues when its cards are used for purchases -- merchant fees withheld from what is remitted to merchants, reported as "discount revenues;" and interest income from cardholders who maintain balances on their AmEx cards.

3.     In addition to issuing its own proprietary cards, AmEx has entered into a series of co-branding relationships with travel providers and retailers. Pursuant to these co-branding relationships, AmEx extends and bears the credit risk, with the travel/merchant provider funding other loyalty perks. AmEx reports the discount revenues and interest income generated through its co-branded cards in its U.S. Card Services operating segment. U.S. Card Services is AmEx's largest

and most important reporting segment, contributing more than 43% of the $28 billion in revenues net of interest expenses AmEx reported on a consolidated basis for fiscal 2013 (ended December 31, 2014).

4.      Since 1999, AmEx has had an exclusive co-branding arrangement with Costco Wholesale Corporation ("Costco") for Costco's United States business.  AmEx also had a separate co-branding agreement with Costco's Canadian operations.  Over the past several years, Costco's net sales have consistently grown, increasing from $70 billion in 2009, to $76.2 billion in 2010, to $87 billion in 2011, to $97 billion in 2012, reaching $102.9 billion in 2013.  As alleged in further detail herein, prior to and during the Class Period, AmEx never disclosed the revenues, loan volume and card issuance that the Company was generating from the Costco U.S co-branding agreement.

5.      On September 17, 2014, Costco Canada announced that Costco Canada would not be renewing its co-branding relationship with AmEx Canada, in favor of another Canadian bank that would issue a co-branded Costco MasterCard.  Shortly thereafter, analysts began to question whether AmEx's U.S. Costco co-branding contract was in danger of non-renewal and news reports, quoting anonymous sources, stated that Costco was soliciting bids for its U.S. co-branding credit card business – reports which AmEx and Costco refused to confirm.

6.      By the start of the Class Period, however, unbeknownst to investors, AmEx and Costco were in discussions about the renewal of the Costco U.S. co-branding agreement, which was set to expire on March 31, 2016.  AmEx had approached Costco early in order to discuss renewing the agreement.  Although investors could have speculated that AmEx was at risk of losing the U.S. Costco co-branding relationship upon its expiration in March 2016, investors did not know that AmEx had decided to accelerate renewal discussions with Costco and did not know the financial impact losing the U.S. Costco co-branding agreement could have on the Company.  Indeed,

Defendants never disclosed the financial impact of the U.S. Costco co-branding agreement on AmEx's reported financial results.  As detailed herein, the U.S. Costco co-branding contract was highly material to AmEx's business – representing 8% of the Company's revenues in 2014; 20% of its outstanding loans and 10% of its cards issued worldwide.

7.      Because AmEx concealed throughout the Class Period just how material the U.S. Costco co-branding relationship was to AmEx's business and financial prospects and thereby overstated the continuing revenue growth prospects of its all-important U.S. Card Services segment, AmEx common stock traded at artificially inflated prices, reaching a Class Period high of nearly $95 per share on December 29, 2014.

8.      Suddenly, on February 12, 2015, AmEx shocked the market by announcing that that it had lost the U.S. Costco co-branding relationship and that the financial impact of that loss would be severe.  AmEx disclosed that the U.S. Costco co-branding agreement generated 8% of the Company's revenues in 2014, that one in ten U.S. AmEx cards had been issued pursuant to the U.S. Costco co-branding arrangement and that 20% of its outstanding loans had been made pursuant to that agreement.  Finally, as a result of the loss of the Costco U.S. co-branding agreement, AmEx stated that the Company's 2015 and 2016 profits would suffer and that the Company would not be able to make any headway on its previous efforts to increase EPS by 12% - 15% during 2015 and 2016 until 2017 at the very earliest.

9.      In response to this announcement, between February 12th and 13th, the price of AmEx common stock plummeted from its close of $85.40 per share on February 11, 2015, to close at $77.53 per share on February 13, 2015, a decline of nearly $8 per share, on unusually heavy trading volume of more than 32 million shares trading on February 12th and more than 34 million shares trading on February 13th, more than six times the average daily trading volume during the

preceding ten trading sessions.  Analysts expressed shock at the impact the loss of the U.S. Costco co-branding agreement would have on AmEx and publicly questioned why the Company had never disclosed the financial impact of the U.S. Costco co-branding agreement.

## JURISDICTION AND VENUE

10.     Jurisdiction is conferred by §27 of the Exchange Act.  The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) .  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the Exchange Act.

11.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as many of the false and misleading statements alleged herein were disseminated from this District and AmEx is headquartered in this District.

12.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

13.     Plaintiff Plumbers and Steamfitters Local 137 Pension Fund, as set forth in the accompanying Certification, which is incorporated by reference herein, purchased AmEx common stock during the Class Period and has been damaged thereby.

14.     Defendant AmEx, based in New York City, together with its subsidiaries, provides charge and credit payment card products and travel-related services to consumers and businesses worldwide.  As of February 13, 2015, the Company had more than one billion shares of common stock issued and outstanding, which trade on the NYSE under the ticker symbol "AXP."

15.     Defendant Kenneth I. Chenault ("Chenault") is, and was throughout the Class Period, the Chairman of the AmEx Board of Directors and AmEx's Chief Executive Officer ("CEO").

16.    Defendant Jeffrey C. Campbell ("Campbell") is, and was throughout the Class Period, a Senior Vice President and the Chief Financial Officer ("CFO") of AmEx.

17.    Defendants Chenault and Campbell are referred to herein as the "Individual Defendants."   AmEx and the Individual Defendants are referred to herein, collectively, as "Defendants."

## CLASS ACTION ALLEGATIONS

18.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of AmEx common stock during the Class Period (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

19.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, AmEx common stock was actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by AmEx and/or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

21.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

22.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented material facts about the business, operations and management of AmEx; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

23.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## BACKGROUND

24.     Defendant AmEx's products and service offerings include charge and credit card products; payments and expense management products and services; consumer and business travel services; stored value products, such as traveler's cheques and other prepaid products; and network services.  The Company's products and services also comprise merchant acquisition and processing, servicing and settlement, point-of-sale, and marketing and information products and services for merchants; fraud prevention services; and the design of customized customer loyalty and rewards programs.

25.     Defendant AmEx sells its products and services to consumers, small businesses, mid-sized companies, and large corporations through direct mail, online applications, in-house and third-party sales forces, and direct response advertising.

26.     The Company has four operating segments: U.S. Card Services, International Card Services, Global Commercial Services, and Global Network & Merchant Services.  The Company has four geographic reporting segments: the United States ("U.S."); Europe, Middle East and Africa ("EMEA"); Japan, Asia/Pacific and Austrailia ("JAPA"); and Latin America, Canada and Caribbean ("LACC").

27.     AmEx generates the following types of revenue:

- *Discount revenue*, AmEx's largest revenue source, which represents fees generally charged to merchants when Card Members use their cards to purchase goods and services at merchants on its network;

- *Net card fees*, which represent revenue earned from annual card membership fees;

- *Travel commissions and fees*, which are earned by charging a transaction or management fee to both customers and suppliers for travel-related transactions;

- *Other commissions and fees*, which are earned on foreign exchange conversions, card-related fees and assessments, Loyalty Partner-related fees and other service fees;

- *Other revenue*, which represents revenues arising from contracts with partners of AmEx's Global Network Services business, insurance premiums earned from Card Member travel and other insurance programs, prepaid card-related revenues, etc.; and

- *Interest on loans*, which principally represents interest income earned on outstanding balances.

28.     Within the Company's U.S. Card Services segment, AmEx issues cards under co-brand agreements with selected commercial firms.  Co-brand card members typically earn rewards provided by the partners' respective loyalty programs based upon their spending on the co-brand cards, such as frequent flyer miles, hotel loyalty points and cash back.  According to AmEx, co-

branding provides lucrative business as "these partnerships can generate high-spending loyal customers."

29.      Costco is a publicly-traded membership warehouse club founded in 1976 in San Diego, California that opened its first membership warehouse store in Seattle in 1983.  Costco operates an international chain of membership warehouses that carry generally higher quality brand name merchandise, generally packaged in larger quantities and generally priced at lower prices than are typically found at conventional wholesale or retail sources.  Costco warehouse stores serve small-to-medium-sized businesses and individuals, and you must have a Costco membership to shop at Costco.  By December 31, 2014, Costco had grown to operate 663 warehouse stores, had 6.9 small business and 31.6 million individual members, and had grown to achieve more than $110.2 billion in annual sales.

30.      AmEx had separate co-branding agreements with Costco Canada and U.S. Costco. The Company's agreement with Costco Canada was set to expire on December 31, 2014, and its agreement with U.S. Costco was to expire on March 31, 2016.

31.      On September 17, 2014, Costco announced that beginning in January 2015, Costco Canada would no longer accept AmEx cards at Costco's Canadian warehouse stores.  Instead, Costco's Canadian warehouse stores would now accept MasterCard.  In an email to AmEx co-brand customers that was widely picked up by the financial media, Costco stated that U.S. Costco stores would continue accepting AmEx cards, stating, in pertinent part, as follows:



Problems viewing this email? Click here.
Pour la version francaise, veuillez cliquer ici.



September 17, 2014

Re: Important notice regarding changes to the American Express credit card program at Costco Wholesale Canada

Dear Member,

The credit card relationship between American Express and Costco Wholesale Canada will not be renewed when it expires on December 31, 2014. All holders of TrueEarnings or American Express Platinum Cash Rebate cards can continue to use their Cards at Costco warehouses and gas stations in Canada, as well as on Costco.ca and everywhere else that accepts American Express, until December 31, 2014.

*       *       *

**American Express cards will continue to be accepted at Costco locations in the United States.** Costco warehouses and gas stations in the U.S. will continue to accept American Express Cards after January 1, 2015, with the exception of TrueEarnings and American Express Platinum Cash Rebate cards issued in Canada.

We're here to help. For more information, please visit your local Costco warehouse or call 1-800-463-3783.

We look forward to seeing you in the warehouse soon.

Lorelle Gilpin
Vice President, Marketing and Membership

®  Registered trademark of Price-Costco International, Inc. used under license.

Costco Wholesale Canada Ltd. | Costco.ca Customer Service 415 West Hunt Club Road | Ottawa, Ontario, Canada  K2E 1C5
© 2014 Costco Wholesale Canada Ltd. all rights reserved.   Customer Privacy Statement   Terms and Conditions

32.     By the start of the Class Period, unbeknownst to investors, AmEx and Costco were in discussions about the renewal of the Costco U.S. co-branding agreement as AmEx had decided to accelerate contract renewal discussions well in advance of the expiration date.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

33.     The Class Period starts on October 16, 2014.  On October 15, 2014, after the close of trading, AmEx issued a press release announcing its financial results for the third quarter of 2014, the period ended September 30, 2014.  Defendant Chenault commented on the results stating, in pertinent part, as follows:

> We delivered another solid quarter of financial results . . . .  Card Member spending was up 9 percent, a modest acceleration from last quarter, and loan balances grew 5 percent.  Revenues continued to rise at a steady pace, but the growth rate is still below our long-term target.

> On the cost side of the ledger, operating expense growth remained on track to come in well below our target for the full year and that's one of the factors that provided the flexibility to invest in both the core business as well as some newer initiatives.

> We developed new partnerships and services with Uber, Apple Pay and McDonald's that are helping us to capitalize on the convergence of online and offline commerce. At the same time, initiatives like the Amex EveryDay Credit Card and OptBlue are helping to make our brand more welcoming and inclusive as we expand into markets not traditionally served by American Express.

> Over the last couple of years we have delivered solid earnings through a combination of disciplined expense control, a strong balance sheet and targeted investments in growth initiatives.  While the economy is stronger, it is not growing as fast or as steadily as most people would like, and those same levers will continue to be an important part of our strategy.

> Our focus will be on delivering earnings growth in an environment that is characterized by rapidly changing technologies, intense competition, regulation and an economy that may continue to grow at only a modest pace.

34.     Later that night, AmEx held a conference call with analysts and investors to discuss the Company's earnings release and operations.  During the conference call, Defendant Campbell

mentioned the loss of the Costco Canadian co-branding contract and noted that AmEx has different

contracts with Costco U.S. stating, in pertinent part, as follows:

> . . . I wanted to touch on the pending loss of our relationship with Costco in Canada. While we are disappointed that we will no longer continue this partnership in Canada, we are excited about the launch of our new cash-back product in the Canadian market, and are focused on retaining many of our customers.
>
> I'll note that *we have separate agreements with Costco in each of the several markets where we maintain a partnership, and have a longer and more significant relationship with Costco in the US, dating back over 15 years.* As with any long-term partnership, *we work with Costco on an ongoing basis to find ways to drive value for both parties going forward,* never losing sight of the fact that we are serving the same customers.
>
> Many of you are aware, the environment for co-branded products has become increasingly competitive. From our side we remain focused on developing attractive value propositions for our card members and co-brand partner that still drive economics for our shareholders.

35. The statements referenced above in ¶¶33 and 34 were materially false and misleading

as they failed to disclose and misrepresented the following adverse facts which were known to

Defendants or recklessly disregarded by them as follows:

(a)    that AmEx had decided to accelerate contract renewal discussions for the U.S.

Costco co-branding agreement, had approached Costco and was attempting to negotiate a renewal of

the agreement which was set to expire in March 2016;

(b)    that the failure to secure a renewal of the U.S. Costco co-branding agreement

would have a significant near-term financial impact;

(c)    that the U.S. Costco co-branding agreement generated approximately 8% of

AmEx's worldwide billed business with over 70% of the spending on the product occurring outside

of Costco warehouses. In addition, another 1% of worldwide billings was generated by other AmEx

card members' spending at Costco;

- 11 -

(d)     that U. S. Costco co-branding was 20% of AmEx's worldwide loans and 10% of AmEx's worldwide cards in force; and

(e)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company and its prospects.

36.     On October 28, 2014, AmEx filed its quarterly financial report on Form 10-Q with the SEC for the period ending September 30, 2014, which was signed by Defendant Campbell and AmEx's Executive Vice President and Corporate Comptroller Linda Zukauckas.  The Form 10-Q did not disclose that AmEx had made a decision to accelerate renewal discussions for the U.S. Costco co-branding agreement far in advance of the agreement's expiration date and that a failure to secure renewal of the co-branding agreement would have a significant near-term financial impact on the Company.  The Form 10-Q also did not disclose the material financial gains generated from the U.S. Costco co-branding agreement, as detailed herein.

37.     Under the rules and regulations governing the preparation of the Form 10-Q, AmEx was required to make disclosures required by Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii).  Item 303(a) requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations."   Given the financial contributions of the U.S. Costco co-branding agreement, AmEx's decision to accelerate renewal discussions for the U.S. Costco co-branding agreement created a known uncertainty that the Company reasonably expected to have "a material favorable or unfavorable impact on the sales or revenues or income from continuing operations" and was, therefore, required to be disclosed in the Form 10-Q.

38.     On November 5, 2014, AmEx announced the pricing of an offering of 750,000 Depositary Shares, each representing a 1/1,000th interest in a 5.200% Fixed Rate/Floating Rate Noncumulative Preferred Share, Series B, $1,000 Liquidation Preference Per Depositary Share at $990 per depository share, resulting in total proceeds to AmEx of $742.5 million (the "Depositary Share Offering"). Expressly citing the "Expected Ratings" AmEx had been promised from the three big corporate debt rating agencies, the Pricing Term Sheet issued that day stated that Moody's would provide a "Baa3 (Stable outlook)" rating, S&P a " BB+ (Stable outlook)" rating, and Fitch a "BBB- (Stable outlook)" rating. The Depository Share offering was completed on or before November 10, 2014.

39.     On December 2, 2014, AmEx announced the pricing of an offering of $600 million of its 3.625% Subordinated Notes due December 5, 2024 (the "Notes Offering"). Again expressly citing the "Expected Ratings" AmEx would obtain from corporate debt rating agencies, the Pricing Term Sheet issued that day stated that Moody's would provide a "Baa1 (Stable outlook)" rating, S&P a " BBB (Stable outlook)" rating, and Fitch an "A (Stable outlook)" rating. The Notes Offering was completed immediately thereafter.

40.     In connection with the Depositary Offering and the Notes Offering, AmEx filed final Prospectuses with the SEC on November 6, 2014 and December 3, 2014, respectively. The final Prospectuses related to a shelf registration statement that AmEx had filed with the SEC (the "Shelf Registration Statement") and together with the Shelf Registration Statement comprised the "Registration Statement" for each offering. Under the rules and regulations governing the preparation of the Registration Statements, the Registration Statements were required to disclose that AmEx had made a decision to accelerate renewal discussions for the U.S. Costco co-branding agreement far in advance of the agreement's expiration date and that a failure to secure renewal of

the co-branding agreement would have a significant near-term financial impact on the Company. The Registration Statements were also required to disclose the material financial gains generated from the U.S. Costco co-branding agreement, as detailed herein.  The Registration Statements, however, contained no such disclosures.

41.     On January 21, 2015, after the close of trading, AmEx issued a press release announcing its financial results for the fourth quarter and full year of 2014, the period ended December 31, 2014.  For the fourth quarter, the Company reported net income of $1.4 billion and diluted earnings per share of $1.39 per share.  Defendant Chenault commented on the results stating, in pertinent part, as follows:

> Solid results this quarter reflected the underlying themes that have characterized our performance throughout 2014: higher Card Member spending, increased loan balances, tight control of operating expenses and a substantial return of capital to shareholders through share repurchases.
>
> Fourth-quarter Card Member spending rose 6 percent (8 percent FX adjusted). Volumes for the year crossed the trillion dollar mark for the first time, reflecting the progress we've made in building customer loyalty, adding new cards and expanding the network of merchants who accept our products.  Loan balances were up 7 percent in the U.S., continuing the progress we've made throughout 2014.  We continue to see opportunities to grow this portfolio with existing and new customers without significantly changing the overall risk profile of the company.
>
> Tight controls on the cost side of the ledger continued to give us the flexibility to invest in growth opportunities.  And, as in the second quarter, a substantial gain allowed us to accelerate some critical initiatives: reengineering to make American Express more efficient; renewing a key partner relationship; and making additional investments to grow our business and drive innovation in the world of payments and commerce.
>
> We've made very good progress against the backdrop of an uneven global economy and the negative impact of a strengthening U.S. dollar.  We see many opportunities for growth, but at the same time, we face competitive and regulatory challenges.  Our aim is to continue to capitalize on the opportunities while dealing with the challenges as we enter 2015.

42.     Later that afternoon on January 21, 2015, AmEx held a conference call with investors and analysts to discuss the Company's earnings results and operations.  During the conference call,

- 14 -

Defendant Campbell was directly asked about the Costco U.S. co-branding arrangement.  The following exchange took place:

> <Q - **Donald Fandetti**>: Yes, Jeff, I was wondering if you could give us your thoughts on when we might hear on the Costco U.S. deal?  And if you could talk a little bit around that, how you balance what appear to be sort of lighter economics on these co-brand deals with the potential lumpiness of a loss of the deal, how you sort of think through that?

> <A - **Jeffrey C. Campbell**>: Well, I appreciate the question, Don.  Clearly, Costco is a very important and long-term partner of ours.  Our U.S. relationship goes back to the 1990s.  We think we have been great partners and have created alot of value for their members, our Card Members, and for both companies.  ***Now, I would point out to you that – I don't think we've said anything about any ongoing discussions we're having with Costco, obviously with very important partners, we are always working every day to evolve the relationship, to make it better and frankly to make sure it's working for both parties.  And you can presume we're doing that with Costco as we're doing it with all of our partners at any time.  And if and when we have any news, as we did with Delta which we chose to renew early, we would certainly tell you.***

> In terms of thinking about the economics of these things, you've certainly heard a number of us, both Ken and I and some of our colleagues talk about the competitive environment for co-brands in recent months and quarters, and that's true.  I think you have to balance those comments with the fact these are still one of many good economic growth opportunities we have as a company.  And while, yes, the environment has become competitive and while certainly there are cases where we conclude because we're pretty selective that we think we're better off not either getting into or proceeding with certain kinds of co-brand partnerships because we have so many other opportunities in our proprietary business.  As a general matter, these still are attractive and important parts of our overall business model.  And when we have great partners where our interests are really aligned, and I'll go back to the recent renewals of Delta and Starwood, we think we can create great value together and for all parties involved.

43.     The statements referenced above in ¶¶41 and 42 were materially false and misleading for the reasons stated above in ¶35.

44.     Then, on February 12, 2015, before the opening of trading, AmEx issued a press release entitled "American Express and Costco U.S. Partnership Agreements Set to End March 31, 2016."  The release quoted Defendant Chenault stating, in pertinent part, that AmEx had "began discussions on a possible renewal with Costco well in advance of the contract expiration," but that

the Company had been "unable to reach terms that would have made economic sense," and that after

March 31, 2016, AmEx cards could no longer be used at Costco.

45.    Shortly after the issuance of the press release, AmEx held a conference call with

analysts and investors to discuss the non-renewal of the U.S. Costco co-branding agreement and

related issues.  At the start of the call, Defendant Chenault acknowledged that the non-renewal

would have a "negative impact on earnings and revenue growth in 2015 and 2016" and that the

Company sought to accelerate contract renewal discussions "knowing that it could have a near-term

financial impact . . . ."  Defendant Campbell detailed the impact of the non-renewal, stating, in

pertinent part, as follows:

> As Ken said, we intend to work to offer value propositions that our card members
> from the Costco relationship will find appealing while also pursuing our many other
> growth opportunities, both of which will entail additional marketing dollars.  The
> cumulative effect of all of these changes will have a significant impact on our 2015
> and 2016 results.
>
> As we have thought about how to best position the company for continued long-term
> growth, we have considered all of these developments and all of our growth
> opportunities.  And I would say that with respect to Costco U.S., there are a number
> of areas of the transition that we will need to work through in the coming months.
>
> That said, the overall impact of all of these factors causes us now to expect that
> overall earnings per share growth in 2015 will likely be flat to down modestly year-
> over-year as we manage through these near-term headwinds and invest aggressively
> to proactively prepare for the termination of the Costco U.S. partnership in 2016.
>
> The full outlook for 2016 is somewhat more complex at this early stage, but we do
> expect to return to earnings per share growth even with the termination of our Costco
> U.S. partnership, which is set to expire at the end of Q1 in 2016.
>
> As all of these items play out over the next two years, we will likely have more
> unevenness in our performance from quarter to quarter than has been typical of our
> business.  Looking beyond 2016, we believe that our 12% to 15% EPS growth target
> remains appropriate beginning again in 2017, which really will be the first period
> where growth rates are not impacted by Costco U.S. and our other co-brand partner
> renewals.
>
> Let me now provide some additional details on the moving parts associated with our
> Costco U.S. relationship, including some of the mechanics by P&L line.  We are still

working through the exact timing and sizing associated with some of these items but we hope this context will be helpful as you think about the future impact on our performance. We will provide additional updates during our Investor Day, which will take place on March 11.

First for context, in 2014 the Costco U.S. co-brand was approximately 8% of our worldwide billed business with over 70% of the spending on the product occurring outside of Costco warehouses. The Costco U.S. co-brand's portfolio makes up about 20% of worldwide loans and about 10% of worldwide cards in force. In addition, about another 1% of our worldwide billings come from other American Express Card members spending at Costco.

We could begin to see a modest slowdown in billings, loans and revenue growth associated with the Costco U.S. co-brand over the course of 2015, and we would expect this slowdown to increase as we near the end of the contract.

46.     During the question and answer period of the conference call, Defendant Campbell was asked why AmEx had not disclosed the details of the U.S. Costco co-branding agreement and responded that the information was not required to be disclosed. The following exchange took place:

> <Q - Moshe Ari Orenbuch>: . . . *Just the follow-up is, just out of curiosity, with 8% to the volume and 20% of the receivables, how was this not – those numbers not disclosed before*? I mean, isn't that – *doesn't that meet a threshold for disclosure*?
>
> <A - Jeffrey C. Campbell>: No. . . . [t]he basic threshold is more driven by revenues and is around 10%. There are some other disclosures rules as well; you would note we've called out Delta in the past, but that's in the guise – or in the context of our airline concentration overall. But when you look at Costco, its metrics don't actually hit any of the thresholds.

47.     In response to the non-renewal of the U.S. Costco co-branding agreement and the disclosure of the financial impact of the non-renewal, the price of AmEx stock declined over the next two trading days – falling from a high of $81.53 per share on February 12, 2015, to close at $77.53 per share on February 13, 2015, on extremely heavy trading volume.

48.     Analysts unanimously acknowledged that AmEx had concealed from the market the materiality of the U.S. Costco co-brand to AmEx's business and financial prospects, concealing the

- 17 -

negative impact losing it would have on AmEx, causing almost all firms to downgrade their earnings models and price targets on AmEx stock. For example:

- **Barclays** issued a report lowering its price target from $96 to $85 per share, stating, in pertinent part, that "*Costco represents a meaningful proportion of AXP's business,*" and that AmEx had "disclosed the proportion of business generated by the Costco co-brand relationship*, which was much more significant than we had previously estimated.*"

- **JP Morgan** issued a report cutting its price target down from $90 to $85 per share, stating, in pertinent part, that the firm was "*cutting [its] 2015 and 2016 estimates for American Express to reflect the loss of the Costco co-brand partnership,*" and that "*the renewal of the contract was an asymmetric risk because consensus estimates implicitly assumed renewal,*" and that "[c]onsequently, *whilewe are lowering our 2015 and 2016 estimates by 9% and 13%,* respectively, we believe **risk to revised estimates has been materially reduced.**"

- **UBS** issued a report lowering its price target from $90 to $83 per share, stating, in pertinent part, that the firm was "*Lowering Forecasts and Valuation as Major Costco Partnership Dies,*" emphasizing that "*[t]his is a significant relationship— 20% of worldwide loans, 10% of worldwide cards in force, 9% of worldwide billed business,*" that "Management noted that **cumulative effect of all the associated changes would have a 'significant impact on [the company's] 2015 and 2016 results'** and guided to "flat to modestly down year-over-year" EPS growth for 2015," and that UBS had consequently "lowered [its] 2015 EPS estimate 4% to $5.55 and [its] 2016 EPS estimate 8% to $5.65." The UBS report also highlighted the "*Marketing Expenses and Restructuring Charges,*" stating the presented "*a significant unknown,*" and that "[d]uring the update call, management noted that the company would "invest aggressively to proactively prepare for the termination of the" agreement," emphasizing that AmEx had "*also mentioned potential restructuring charges.*"

- **Evercore ISI** issued a report entitled "*Costco Loss Costs Dearly,*" lowering their price target to $82 per share, emphasizing "*COST business bigger than expected,*" and stating, in pertinent part, that "*billings and receivables growth are expected to decline sharply.*"

- **Jefferies** issued a report lowering its price target from $95 to $85 per share, emphasizing, in pertinent part, that the firm had "*lowered [its] FY15 and FY16 estimates as [it] expect[ed] near-term marketing and rewards expenses to increase,*" and that it would "*continue to stay on the sidelines on AXP as [it] believe[d] top-line headwinds [were] likely to persist.*" The Jefferies report also emphasized that the "*[f]inancial implications of the Costco relationship [were] not immaterial,*" and that "[m]anagement noted that over 70% of the spending for these customers occurred outside of Costco where arguably AXP incurs higher margins than within the Costco network.*"

- **RBS** issued a report entitled "**Amex Loses Crown Jewel Costco US Cobrand Relationship - Materially Negative**, High Sector Competition Hits Home," which stated, in pertinent part, that "**the loss of its key Costco US cobrand relationship . . . has meaningful ramifications for the business**," and that the disclosure that "Costco cobrand card spending was disclosed as 8% of the company's total spending volume, 20% of loans, and 10% of US cards in force [was] **much more meaningful than most believed, in our view.**"  The RBS report further cautioned that "**Costco was AXP's crown jewel of cobrand partners, and in our minds strikes at the heart of our negative view on Amex** - competition is very high in the company's business, **and the loss of this key relationship exemplifies challenges here**."  The report further emphasized that "**the loss clearly has meaningful earnings implications as well**" and that RBS "remain[ed] negative on AXP shares. . . ."

- **RBS** issued a second report on February 13, 2015, this time lowering its price target to $74, emphasizing that "**[m]agnitude of the relationship to the business was previously undisclosed, but is also very sizable - 8% of worldwide billed business volume, 20% of worldwide loans, and 10% of cards in force.**"  In its second report, RBS added that "[w]hile Amex aims to offset the Costco loss with new business, **we are concerned this will prove challenging given high industry competition and magnitude of the lost relationship.**"  This report further emphasized that "**[a] one-time restructuring charge is also likely forthcoming in 2015** - as seems par for the course in the past few years - **to help address challenges**," and stating that the firm's "price target comes down to $74."

- **Credit Suisse** issued a report lowering its price target from $83 to $78 which stated, in pertinent part, that "**Up to ~$90Bn/yr. of Spending Could be at Risk**.  We believe approximately $90Bn (or 9% of Amex's worldwide spend) is associated with Costco US, either within the retailer's stores or on Costco cobranded cards.  Additionally, we estimate that over $14Bn (or 20% of Amex's worldwide loans) are related to Costco, which we believe will be sold to the new issuer."

- **MacQuarie Research** issued a report lowering its target price from to $81 per share, and emphasizing, in pertinent part, as that the firm had concluded that "**2015E and 2016E will be transition years for American Express as the company seeks to 1) retain Costco customers and 2) replace transaction fees and loans lost with the Costco relationship**," and that MacQuarie was "**Skeptical about Growing Card Spend as we think American Express will grow spend at the expense of margin, particularly with new cobranded relationships to replace Costco**."

- **Sandler O'Neill + Partners** issued a report lowering its price target to $90, and emphasizing, in pertinent part, that "**Costco U.S. represents a sizable relationship for AXP.**"  Sandler O'Neill's report stated that only "**a portion** of this risk had been priced into the stock as some investors viewed the loss of Costco Canada as a precursor to the loss of the U.S. portfolio."

- **Oppenheimer** issued report entitled "**The Hits Keep Coming**" which stated, in pertinent part, that "[w]hile AXP headwinds have been known for some time, **this**

*morning's announcement of the loss of the Costco US partnership only adds to the list and duration of EPS pressures. . . . **We learned today that the company faces EPS pressures through at least 2016"** and that "[m]anagement guided that it would not return to the long-term EPS growth goal of 12-15% until 2017+ and 2015 would be flat at best."*

- ***Buckingham Research Group*** issued a report lowering its price target from $104 to $95, emphasizing, in pertinent part, that"*[t]he loss of Costco related business will reduce billed business, card loans, revenues, and to a lesser extent earnings, next year.*" Though the report reiterated management's erroneous claim on February 12th that the Costco co-brand was not "material" enough to warrant customer concentration disclosure, the report acknowledged that *"Costco cards account for about $14B or 20% of Amex's total card loans"* which the firm estimated "*probably accounted for about 3-4% of income.*"

49.     On or about February 18, 2015, corporate debt rater Moody's issued a ratings report entitled "Costco Loss Is Credit Negative for American Express' Card ABS." Fitch's report on or about February 18, 2015 also found that the loss of the U.S. Costco relationship added earnings pressure to the Company's existing near-term challenges.

50.     The market for AmEx common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, AmEx common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired AmEx common stock relying upon the integrity of the market price of AmEx common stock and market information relating to AmEx, and have been damaged thereby.

51.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of AmEx common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

52.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about AmEx's business, prospects, and operations.  These material misstatements and omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of AmEx and its business, prospects, and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing AmEx common stock at artificially inflated prices, thus causing the damages complained of herein.  When the true facts about the Company were revealed to the market, the inflation in the price of AmEx common stock was removed and the price of AmEx common stock declined dramatically, causing losses to Plaintiff and the other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

53.     As alleged herein, AmEx and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding AmEx, their control over, and/or receipt and/or modification of AmEx's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning AmEx, participated in the fraudulent scheme alleged herein.

- 21 -

## NO SAFE HARBOR

54.     The "Safe Harbor" warnings accompanying AmEx' reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

55.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of AmEx who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICATION OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET

56.     Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

        (a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

        (b)     the omissions and misrepresentations were material;

        (c)     AmEx common stock traded in an efficient market;

(d)      the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of AmEx common stock; and

(e)      Plaintiff and other members of the Class purchased AmEx common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

57.      At all relevant times, the market for AmEx common stock was efficient for the following reasons, among others:

(a)      as a regulated issuer, AmEx filed periodic public reports with the SEC; and

(b)      AmEx regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## LOSS CAUSATION/ECONOMIC LOSS

58.      During the Class Period, as detailed herein, Defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of AmEx common stock and operated as a fraud or deceit on Class Period purchasers of AmEx common stock by misrepresenting the value of the Company's business and prospects as detailed herein.  As Defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of AmEx common stock fell precipitously, as the prior artificial inflation came out of the price.  As a result of their purchases of AmEx common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

59.    Plaintiff incorporates ¶¶1-58 by reference.

60.    During the Class Period, these Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

61.    The Defendants named in this Count violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of AmEx common stock during the Class Period.

62.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AmEx common stock.  Plaintiff and the Class would not have purchased AmEx common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these Defendants' misleading statements.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against All Defendants

63.    Plaintiff incorporates ¶¶1-62 by reference.

- 24 -

64.     The Individual Defendants acted as controlling persons of AmEx within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, and their ownership of AmEx common stock, the Individual Defendants had the power and authority to cause AmEx to engage in the wrongful conduct complained of herein.  AmEx controlled the Individual Defendants and all of the Company's employees.  By reason of such conduct, these Defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Plaintiff demands a trial by jury.

- 25 -

DATED:  July 30, 2015

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY

SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

CAVANAGH & O'HARA
PATRICK O'HARA
JOHN T. LONG
407 E. Adams Street
Springfield, IL 62701
Telephone:  217/544-1771

*Attorneys for Plaintiff*

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

PLUMBERS AND STEAMFITTERS LOCAL 137 PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of

AMEX

any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _28th_ day of _July_____, 2015.

PLUMBERS AND STEAMFITTERS
LOCAL 137 PENSION FUND

By: _____

Its: _____

- 2 -

AMEX

SCHEDULE A

SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 11/20/2014 | 700 | $90.70 |
| 12/01/2014 | 500 | $92.35 |
| 12/03/2014 | 350 | $91.18 |