UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
                              :

PLUMBERS AND STEAMFITTERS LOCAL  :   Civil Action No. 15-cv-05999 (PGG)
137 PENSION FUND, Individually and on     :
Behalf of All Others Similarly Situated,       :   AMENDED COMPLAINT
                              :
              Plaintiff,         :
                              :
       vs.                 :   DEMAND FOR JURY TRIAL
                              :
AMERICAN EXPRESS COMPANY,       :
KENNETH I. CHENAULT and JEFFREY C.   :
CAMPBELL,                        :
                              :
            Defendants.     :
                              :
———————————————————— x

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ...................................................................................1

II.    JURISDICTION AND VENUE .............................................................................7

III.   PARTIES ................................................................................................................8

IV.    CLASS ACTION ALLEGATIONS .....................................................................10

V.     SUBSTANTIVE ALLEGATIONS ......................................................................12

       A.    Relevant Background ................................................................................12

             1.    AmEx and Its Business Model....................................................12

             2.    AmEx's Co-Brand Agreements ...................................................13

                   (a)    The Costco Co-Brand Agreements .................................13

                   (b)    AmEx Disclosed and Quantified the Delta Agreement at
                          the SEC's Request, Creating the False Impression that It
                          Was More Significant than the Costco U.S. Agreement
                          During the Class Period ...................................................14

                          (i)    AmEx's 2008 and 2009 Disclosures Concerning the
                                 Significance of the Delta and Costco Co-Brand
                                 Agreements ........................................................14

                          (ii)   AmEx's Disclosures Concerning the Significance of
                                 the Delta Agreement Beginning in 2012 ...........................15

                          (iii)  AmEx's Disclosures Created the False Impression
                                 that the Delta Agreement Was More Significant
                                 than the Costco U.S. Agreement.......................................16

                          (iv)   Defendants Knew or Were Reckless with Respect to
                                 Whether AmEx's Disclosures Concerning the Delta
                                 and Costco Co-Brand Agreements Were Misleading........18

       B.    AmEx Loses the Costco Canada Agreement and Learns that Costco Views
             the Company as Just Another "Vendor"....................................................19

VI.    Defendants' Materially False and Misleading Statements and Omissions During
       the Class Period...................................................................................................20

       A.    Defendants' Material Omissions Pertaining to Known Trends and
             Uncertainties Concerning the Renewal of the Costco U.S. Agreement ...............21

1. Falsity..................................................................................................21

    (a)   Defendants' Failure to Disclose the Expected Impact of a
Known Trend Concerning the Increasingly Intense
Competition for Co-Brand Agreements........................................22

    (b)   Defendants' Failure to Disclose a Known Uncertainty
Concerning the Renewal of the Costco U.S. Agreement and
the Expected Impact of Nonrenewal on AmEx's Financial
Condition....................................................................................23

2. Scienter ...............................................................................................25

B. Defendants' Materially False and Misleading Statements Quantifying and
Disclosing the Significance of the Delta Agreement but Not the Costco
U.S. Agreement..................................................................................................26

1. Falsity..................................................................................................26

2. Scienter ...............................................................................................28

C. Defendants' Material Omissions Concerning the Renewal of the Costco
U.S. Agreement and the Magnitude of the Potential Impact of Nonrenewal
on AmEx's Financial Condition ........................................................................29

1. Falsity..................................................................................................29

2. Scienter ...............................................................................................29

D. Defendants' Materially False and Misleading Statements Concerning the
Renewal of the Costco U.S. Agreement and the Magnitude of the Potential
Impact of Nonrenewal on AmEx's Financial Condition ...................................30

1. Falsity..................................................................................................30

2. Scienter ...............................................................................................32

E. Defendants' Materially False and Misleading Statements Contrasting the
Costco Canada Agreement and the Costco U.S. Agreement, Which
Defendants Had a Duty to Update .....................................................................33

1. Falsity..................................................................................................33

2. Scienter ...............................................................................................34

VII. ADDITIONAL SCIENTER ALLEGATIONS RELEVANT TO ALL CLAIMS ...........35

VIII. LOSS CAUSATION/ECONOMIC LOSS .......................................................................36

IX.    MATERIALITY ............................................................................................41

X.     POST-CLASS PERIOD DEVELOPMENTS.................................................42

XI.    NO SAFE HARBOR ...................................................................................43

XII.   APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE
       MARKET.....................................................................................................44

XIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE: *AFFILIATED UTE*
       DOCTRINE ................................................................................................44

XIV.   CAUSES OF ACTION ...............................................................................45

FIRST CAUSE OF ACTION For Violations of §10(b) of the Exchange Act and Rule
       10b-5 Promulgated Thereunder with Respect to Material Omissions Pertaining to
       Known Trends and Uncertainties Concerning the Renewal of the Costco U.S.
       Agreement (Against All Defendants) ...............................................................45

SECOND CAUSE OF ACTION For Violations of §10(b) of the Exchange Act and Rule
       10b-5 Promulgated Thereunder with Respect to Materially False and Misleading
       Statements Quantifying and Disclosing the Significance of the Delta Agreement
       but Not the Costco U.S. Agreement (Against All Defendants) .........................48

THIRD CAUSE OF ACTION For Violations of §10(b) of the Exchange Act and Rule
       10b-5 Promulgated Thereunder with Respect to Material Omissions Concerning
       the Renewal of the Costco U.S. Agreement and the Magnitude of the Potential
       Impact on Nonrenewal on AmEx's Financial Condition (Against All Defendants) .........50

FOURTH CAUSE OF ACTION For Violations of §10(b) of the Exchange Act and Rule
       10b-5 Promulgated Thereunder with Respect to Materially False and Misleading
       Statements Concerning the Renewal of the Costco U.S. Agreement and the
       Magnitude of the Potential Impact on Nonrenewal on AmEx' Financial Condition
       (Against All Defendants) ...............................................................................52

FIFTH CAUSE OF ACTION For Violations of §10(b) of the Exchange Act and Rule
       10b-5 Promulgated Thereunder with Respect to Materially False and Misleading
       Statements Contrasting the Costco Canada Agreement and the Costco U.S.
       Agreement, Which Defendants Had a Duty to Update (Against All Defendants) ............54

SIXTH CAUSE OF ACTION For Violations of §20(a) of the Exchange Act (Against the
       Individual Defendants)...................................................................................56

XV.    PRAYER FOR RELIEF ..............................................................................57

XVI.   JURY DEMAND .........................................................................................58

Lead Plaintiff Pipefitters Union Local 537 Pension Fund ("Local 537" or "Lead Plaintiff") makes the following allegations based on the investigation undertaken by its counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings made by American Express Company ("AmEx" or the "Company"), as well as securities analysts' reports and advisories, press releases, media reports and other public statements issued by or about the Company. These allegations are further supported by the first-hand knowledge of a confidential witness ("CW1") who was a Vice President of Strategic Relationship Management at the Company. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of all purchasers of AmEx common stock between September 17, 2014 and February 11, 2015, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

2.      Defendant AmEx provides charge and credit payment card products and travel-related services to consumers and businesses worldwide. In addition to issuing its own proprietary cards, AmEx has entered into a series of agreements with select retailers and travel providers, such as Costco Wholesale Corporation ("Costco") and Delta Air Lines ("Delta"), to offer co-branded cards. AmEx reports the revenues generated by its co-branded cards in its U.S. Card Services operating segment. U.S. Card Services is AmEx's largest and most important reporting segment, contributing $17.9 billion—more than 52% of the Company's $34.3 billion in revenues net of expenses as of December 31, 2014.

*AmEx's Co-Brand Agreements with Costco*

3.      Since 1999, AmEx had an exclusive co-brand agreement with Costco for Costco's United States business (the "Costco U.S. Agreement"). Since 2010, AmEx also had a separate co-brand agreement with Costco for Costco's Canadian operations (the "Costco Canada Agreement"). The Costco U.S. Agreement was set to expire on March 31, 2016 and the Costco Canada Agreement was set to expire December 31, 2014.

4.      On September 17, 2014, Costco announced that it would not be renewing the Costco Canada Agreement. In response to that announcement, Defendants reassured investors that the nonrenewal of the Costco Canada Agreement did ***not*** impact the much more significant Costco U.S. Agreement and that AmEx cards would continue to be accepted in Costco's U.S. stores.

5.      However, at the time that Defendants represented to the market that the Costco U.S. Agreement was not in jeopardy, unbeknownst to investors, AmEx had already initiated early negotiations with Costco concerning the renewal of the Costco U.S. Agreement and, as a result of AmEx's approach, Costco decided to open the process to other potential partners. Indeed, as Defendant Chenault admitted at the end of the Class Period, the Company's decision to approach Costco long before the expiration of their co-brand agreement put in motion events that Defendants admittedly knew could have a material adverse "near-term financial impact" on the Company in the event that it failed to secure the renewal.

6.      Defendants also knew, but did not disclose, that there was a significant risk that AmEx would not be able to secure the renewal of the Costco U.S. Agreement, which was set to expire on March 31, 2016. Defendants knew this because, during the Class Period, unbeknownst to investors, Costco told AmEx that it considered the Company to be just another "vendor" and

was solely focused on the price that the Company would charge Costco under its co-brand agreement. For example, in a conversation during a CEO-to-CEO telephone call in January 2015 (which was reported by *Bloomberg* only after the end of the Class Period), Costco CEO Craig Jelinek personally told AmEx's CEO, Defendant Kenneth Chenault, that AmEx was just a "vendor," just like those that sold Costco "ketchup." Indeed, Jelinek made Costco's position crystal clear to Chenault, stating, ***"If I can get cheaper ketchup somewhere else, I will."***[1]

7.      Significantly, statements like Mr. Jelinek's represented a rejection of AmEx's entire value proposition as a company. AmEx is well known for its unique "premium" pricing model, under which it charges merchants higher fees than its competitors in order to fund the benefits and rewards that the Company bestows on its cardholders. AmEx's value proposition to merchants is premised on the fact that this premium pricing model is justified because it attracts high-spending customers that are more valuable to merchants than those of the Company's chief competitors, such as Visa Inc. ("Visa") and MasterCard Inc. ("MasterCard"). However, AmEx's premium pricing model prevents the Company from being able to compete ***solely*** on the basis of lowering the fees that it charges merchants in exchange for the ability to accept AmEx cards.

8.      Costco's private communication to AmEx of a single-minded focus on the price that it would be charged by the Company made Defendants aware of a significant undisclosed risk that the Company would not be able to offer terms acceptable to Costco and secure the renewal of the Agreement. That risk became even more serious when Costco followed through on its threats to replace AmEx with a co-brand partner that could offer lower pricing and terminated the Costco Canada Agreement in favor of a co-brand agreement with MasterCard. Thus, as of September 17, 2014, when Costco announced that it would not be renewing the

---

[1] Herein, all emphasis is added.

Costco Canada Agreement, Defendants knew or were reckless with respect to the significant undisclosed risk that AmEx would not be able to secure the renewal of the Costco U.S. Agreement either.

9.      Because Defendants failed to disclose the amount of business AmEx derived from the Costco U.S. Agreement, investors could not appreciate the true financial risk to the Company of losing the Costco U.S. Agreement. Indeed, the "Risk Factors" section of AmEx's SEC filings created the false impression that the Company's co-brand agreement with Delta (the "Delta Agreement") was more significant to the Company than the Costco U.S. Agreement. This is so because the "Risk Factors" explicitly mentioned both the Delta Agreement and the Costco U.S. Agreement but quantified and disclosed only the former Agreement's significance to the Company. Quantifying the Delta Agreement but not the Costco U.S. Agreement created the false impression that the Delta Agreement was the more significant of the two agreements.

10.     ***Significantly, on a conference call with analysts and investors on January 21, 2015, AmEx's CFO, Defendant Jeffrey Campbell, admitted that the Delta Agreement, which represented just 5% of AmEx's billed business, "rises to a level that, from an SEC perspective, we should disclose."*** Defendant Chenault also participated on that same call. Thus, given the disclosure of the size of the Delta Agreement, Defendants knew or were reckless with respect to AmEx's duty to disclose the size of the much larger Costco U.S. Agreement, which Defendants failed to do.

***Disclosures Concerning the Nonrenewal of the Costco U.S. Agreement***

11.     On February 12, 2015, AmEx shocked the market by announcing that it had lost the Costco U.S. Agreement. Moreover, AmEx disclosed that the financial impact of the loss of the Costco U.S. Agreement was much more severe than anyone had anticipated. Specifically,

AmEx disclosed that the Agreement generated *8%* of AmEx's worldwide billed business (and another *1%* of worldwide billings was generated by other AmEx cardholders' spending at Costco), that *one in ten* AmEx cards worldwide had been issued pursuant to the Costco U.S. Agreement, and that *20%* of the Company's outstanding loans had been made pursuant to that Agreement. By contrast, the Delta Agreement, which AmEx had repeatedly quantified and disclosed in its SEC filings, represented just *5%* of the Company's billed business and *15%* of its outstanding loans.

12.     In response to these announcements, the price of AmEx common stock dropped from $86.01 per share on February 11, 2015, to its close at $78.08 per share on February 13, 2015, a decline of nearly $8 share on extremely heavy trading volume. This drop wiped out approximately $7.7 billion of AmEx's market capitalization.

13.     Analysts expressed shock at the impact the loss of the Costco U.S. Agreement would have on AmEx and downgraded their ratings and price targets on AmEx stock. For example, Barclays Equity Research noted that the "proportion of business generated by the Costco co-brand relationship, [] was *much more significant* than we had previously estimated." Likewise, Evercore ISI issued a report noting that the effect was ***"bigger than expected."***

### The Alleged Misstatements and Omissions

14.     Based on the foregoing facts, which are set forth in greater detail below, Lead Plaintiff alleges five related but distinct causes of action:

(a)     Defendants failed to disclose known trends and uncertainties, as required by Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item 303"):

(i)     Defendants failed to disclose a known uncertainty with respect to the renewal of the Costco U.S. Agreement—in light of both Costco's position that AmEx was

just another "vendor" and the fact that the nonrenewal of the Costco Canada Agreement had already spurred Defendants to initiate early negotiations with Costco concerning the renewal of the Costco U.S. Agreement, which caused Costco to solicit competitive bids from other parties—as well as the expected material adverse "near-term financial impact" to the Company should the Costco U.S. Agreement not be renewed.

   (ii)  Defendants disclosed a known trend of increased competition with respect to co-brand agreements in general, but failed to quantify and disclose the expected impact of that trend, as required by Item 303.

   (b)  Defendants made materially misleading statements that created the false impression that the Delta Agreement was more significant to AmEx than the Costco U.S. Agreement by repeatedly quantifying and disclosing the significance of the former but omitting material facts about the significance of the latter in the Company's SEC filings.

   (c)  Defendants failed to disclose material adverse facts concerning the Costco U.S. Agreement, which, by September 17, 2014, Defendants had a duty to disclose in light of the risk that Defendants would not secure the renewal of the Agreement and the magnitude of the potential impact of nonrenewal on AmEx's financial condition. Specifically, particularly in light of Defendants' misleading statements concerning the significance of the Delta Agreement, Defendants' failure to disclose the material adverse facts that the nonrenewal of the Costco Canada Agreement had already spurred Defendants to initiate early negotiations with Costco concerning the renewal of the Costco U.S. Agreement, and that the outcome of those negotiations would have a material adverse impact on AmEx's financial condition, was misleading. On January 21, 2015, Defendants lied to investors concerning the status of the Costco U.S. Agreement by representing that

there were no ongoing negotiations with Costco U.S. In truth, Defendants had already initiated early negotiations with Costco concerning the renewal of the Costco U.S. Agreement and, as Defendants were aware and later admitted, the outcome of those negotiations would have a material adverse "near-term financial impact" on AmEx.

(d)     On September 18 and October 15, 2014, Defendants made reassuring statements contrasting the Costco Canada Agreement with the Costco U.S. Agreement, which Defendants had a duty to update when they subsequently became materially false and misleading because the nonrenewal of the Costco Canada Agreement spurred Defendants to initiate early negotiations with Costco concerning the renewal of the Costco U.S. Agreement.

## II.     JURISDICTION AND VENUE

15.     Jurisdiction is conferred by Section 27 of the Exchange Act. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5). This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act.

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) as many of the false and misleading statements alleged herein were disseminated from this District and AmEx is headquartered in this District.

17.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.    PARTIES

18.    Lead Plaintiff Pipefitters Union Local 537 Pension Fund, as set forth in its Certification which was previously filed in this action and is incorporated by reference herein, purchased AmEx common stock during the Class Period and has been damaged thereby.[2]

19.    Defendant AmEx, a public company based in New York City, has more than one billion shares of common stock issued and outstanding, which trade on the New York Stock Exchange (the "NYSE") under the ticker symbol "AXP."

20.    Defendant Kenneth I. Chenault is, and was throughout the Class Period, the Chairman of the AmEx Board of Directors and AmEx's CEO.

21.    Defendant Jeffrey C. Campbell is, and was throughout the Class Period, a Senior Vice President and the CFO of AmEx.

22.    Defendants Chenault and Campbell are referred to herein as the "Individual Defendants." AmEx and the Individual Defendants are referred to herein, collectively, as "Defendants."

23.    During the Class Period, the Individual Defendants and other unnamed AmEx officers were privy to confidential and proprietary information concerning AmEx, its operations, finances, financial condition and present and future business prospects. Because of their positions with AmEx, the Individual Defendants and other unnamed AmEx officers had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings

---

[2] This action was initially filed on July 30, 2015 by named plaintiff Plumbers and Steamfitters Local 137 Pension Fund ("Local 137"). ECF No. 1. The Court subsequently appointed Local 537 as Lead Plaintiff. ECF No. 28.

and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants and other unnamed AmEx officers knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

24.     Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of AmEx's business.

25.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

26.     As controlling persons of a publicly-traded company whose stock was registered with the SEC pursuant to the Exchange Act, and was traded on the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to AmEx's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to update any previously issued statements that had become materially misleading or untrue, so that the market price of AmEx common stock would be based

upon truthful and accurate information. Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of AmEx common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public about AmEx's business, operations, and the intrinsic value of AmEx common stock; and (ii) caused Lead Plaintiff and other members of the Class to purchase AmEx common stock at artificially inflated prices.

## IV.     CLASS ACTION ALLEGATIONS

28.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons that purchased publicly-traded AmEx common stock during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are: (i) Defendants; (ii) any member of the immediate family of an Individual Defendant; (iii) any person who was an officer or director of AmEx during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) AmEx's employee retirement and benefit plan(s); and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

29.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AmEx common stock was actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds of thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by AmEx and/or its transfer agent and may

be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the Exchange Act was violated by Defendants as alleged herein;

(b)     whether statements made by Defendants misrepresented material facts about the business, operations and management of AmEx; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## V.   SUBSTANTIVE ALLEGATIONS

### A.   Relevant Background

#### 1.   AmEx and Its Business Model

34.   AmEx's business model—which is materially different than that of its primary competitors, Visa and MasterCard—is integral to the Company's value proposition to merchants. Unique in the industry, AmEx's primary source of revenue is derived on the "spend" side of the transaction, *i.e.*, from fees charged to merchants each time a cardholder makes a purchase using an AmEx card. The fee is typically an agreed-upon percentage applied to the total sale made by the merchant, plus flat fees. In contrast, AmEx's chief competitors (*i.e.*, Visa and MasterCard), and the banking institutions that issue their cards, generate most of their revenue on the "lend" side of the transaction, *i.e.*, from interest and fees charged to cardholders who maintain monthly balances on their accounts under revolving credit facilities. In other words, AmEx generally makes money from merchants and the Company's competitors generally make money from cardholders.

35.   For example, assuming AmEx charged Merchant X fees of 0.6% (known in the industry as a "discount rate") under a co-brand agreement, if a cardholder purchased a $1,000 flat-screen television from Merchant X using her AmEx card, then AmEx would retain $6 (0.6% of $1,000) on the sale of the television and remit $994 to Merchant X. AmEx would not charge the cardholder anything if she pays off her balance by the end of the billing cycle (as the Company's cardholders generally do). If, on the other hand, Visa processed the transaction for Costco and charged a 0.1% discount rate, then Visa would retain $1 (0.1% of $1,000) on the sale of the television and remit $999 to Merchant X. However, Visa and the bank that issued the card would expect to make more money on the transaction by allowing the cardholder to maintain a monthly balance on her card and charging her interest and fees on the balance.

- 12 -

36.     AmEx's value proposition to merchants encourages its cardholders to spend more on an annual and per transaction basis by offering generous rewards programs, superior customer service, and other benefits. The expense of providing these rewards and services translates into a certain amount of "cardholder insistence" and loyalty by AmEx cardholders, which purportedly means that cardholders would shop elsewhere or spend less if a merchant does not accept AmEx cards. In marketing the ability to accept AmEx cards to merchants, the Company cites this phenomenon of cardholder insistence, claiming that it is justified in charging higher fees to merchants because it can deliver high-value customers who will spend more.

### 2.     AmEx's Co-Brand Agreements

37.     AmEx issues co-branded cards under co-brand agreements with selected commercial partners. A co-brand cardholder typically earns rewards (*e.g.*, frequent flyer miles, hotel loyalty points, cash back) which are provided by AmEx's co-brand partners' loyalty program based on the amount of the cardholder's spending on the co-branded card. According to AmEx, co-branding provides lucrative business as "these partnerships can generate high-spending loyal customers." According to AmEx, co-brand agreements are entered for a fixed period, generally ranging from five to eight years.

38.     AmEx reports the revenues and interest income that the Company generates through its co-branded cards in its U.S. Card Services operating segment. U.S. Card Services is AmEx's largest and most important reporting segment, contributing $17.9 billion—more than 52% of the Company's $34.3 billion in revenues net of expenses as of December 31, 2014.

### (a)     The Costco Co-Brand Agreements

39.     Costco is a publicly-traded membership warehouse club founded in 1976 in San Diego, California, that opened its first membership warehouse store in Seattle in 1983.

40.     Costco operates an international chain of membership warehouses that generally carries higher quality brand name merchandise which is packaged in larger quantities and priced lower than products typically found at conventional wholesale or retail stores.

41.     In August 1999, AmEx announced that it was the "First and Only of Three Big Card Companies Accepted at Costco Warehouses." Per this exclusive Agreement, Costco members could enjoy AmEx's "Purchase Protection," which insures consumer purchases against accidental damage or theft for 90 days, as well as Costco's Membership Rewards program, which allows customers to earn points on all their Costco purchases and later redeem those points for shopping or travel rewards.

42.     During the Class Period, AmEx had separate co-branding agreements with Costco with respect to Costco's U.S. and Canadian operations. The Costco Canada Agreement was set to expire on December 31, 2014, and the Costco U.S. Agreement was to expire on March 31, 2016.

**(b)     AmEx Disclosed and Quantified the Delta Agreement at the SEC's Request, Creating the False Impression that It Was More Significant than the Costco U.S. Agreement During the Class Period**

43.     AmEx's Delta Agreement dates back to 1996 and was renewed by the Company in December 2008 and again in January 2015. The Delta Agreement includes exclusive co-brand card partnerships and other arrangements, including membership rewards, merchant acceptance, and travel.

**(i)     AmEx's 2008 and 2009 Disclosures Concerning the Significance of the Delta and Costco Co-Brand Agreements**

44.     The last time that AmEx had quantified and disclosed the amount of the Company's business attributable to its co-brand agreements was several years before the Class

- 14 -

Period, in 2008. On August 6, 2008, AmEx held its second annual Financial Community Meeting, which was attended by Defendant Chenault. Al Kelly, AmEx's then-President of U.S. Card Services, gave a presentation on U.S. Credit and Spending Trends. That presentation included a slide titled "Q2'08 US Card Services Managed Loans Distribution," which stated that, at the time, Delta and Costco accounted for 13% and 14% of AmEx's receivables, respectively:

> As you can see from this chart, our A/R is not concentrated heavily in any one portfolio. It is: 28 percent in Blue [Family], 22 percent in Lending on Charge, **13 percent Delta**, **14 percent Costco**, 8 percent Other Small Businesses, and 15 percent Other Consumer Credit Cards. These relative percentages haven't changed much since I presented at this meeting in February 2006.

45.     However, the following year, after the then-recent merger of Delta and Northwest Airlines, Defendant Chenault publicly stated that the Delta Agreement had surpassed AmEx's other co-brand agreements in size. Specifically, during an August 5, 2009 Financial Community Meeting, while discussing AmEx's focus on co-branded cards, Chenault stated, "***Our largest co-brand partner is the new airline combination of Delta and Northwest***."

### (ii)     AmEx's Disclosures Concerning the Significance of the Delta Agreement Beginning in 2012

46.     In 2012, at the request of the SEC, AmEx issued revised disclosures quantifying the amount of its business attributable to the Delta Agreement. Specifically, on June 26, 2012, Defendant Chenault personally received a Comment Letter from the SEC Division of Corporate Finance stating that the SEC had reviewed the AmEx's draft Form 10-K for fiscal year 2011 and, in particular, the following "Risk Factor":

> ***We have agreements with business partners in a variety of industries, including the airline industry, that represent a significant portion of our billed business.*** We are exposed to the risk of downturns in these industries, including bankruptcies, restructurings and consolidations of our partners, and the possible obligation to make payments to our partners.
>
> ***In the ordinary course of our business we enter into different types of contractual arrangements with business partners in a variety of industries. For***

- 15 -

*example, we have partnered with Costco to offer co-branded cards for consumers and small businesses*, and through our Membership Rewards program we have partnered with businesses in many industries, most notably the airline industry, to offer benefits to Cardmember participants. . . . *The airline industry represents a significant portion of our billed business* and in recent years has undergone bankruptcies, restructurings, consolidations and other similar events. In particular, we are exposed to risk under our agreements with Delta Air Lines, which were restructured in connection with Delta's filing for protection under Chapter 11 of the Bankruptcy Code . . . .

47.     The SEC staff instructed AmEx to expound upon the above Risk Factor and address in its SEC filings "the portion of your billed business and worldwide Cardmember loans that the airline industry and Delta Air Lines account for."

48.     AmEx subsequently disclosed the percentage of the Company's billed business and outstanding loans attributable to the Delta Agreement in the Company's Form 10-K for the year ended December 31, 2012 (the "2012 10-K"). The 2012 10-K stated: "Delta SkyMiles Credit Card co-brand portfolio accounts for approximately *5 percent* of the Company's worldwide billed business and less than *15 percent* of worldwide Cardmember loans."

> (iii)     **AmEx's Disclosures Created the False Impression that the Delta Agreement Was More Significant than the Costco U.S. Agreement**

49.     After the loss of the Costco U.S. Agreement, in AmEx's 2014 10-K, the Company stated that the Delta Agreement represented 6% of billed business and 15% of worldwide cardholder loans. *The Company also disclosed that the Costco U.S. Agreement represented a larger percentage of the Company's business than the Delta Agreement when measured by both billed business and cardholder loans, as the Costco U.S. Agreement represented 9% of billed business ($92.05 billion) and 20% of cardholder loans ($14.08 billion).*

50.     Indeed, the below chart demonstrates that, in 2014, the Costco U.S. Agreement accounted for about *150% more* than the Delta Agreement in terms of billed business and *at least 133% more* than the Delta Agreement in terms of loans.

- 16 -

| | **Billed Business** | **Loans** | **Cards in Force** |
|---|---|---|---|
| **AmEx** | $1,022.85 billion | $70.4 billion | 112.2 million |
| **Costco U.S. Agreement** | 9% ($92.05 billion)* | 20% ($14.08 billion) | 10% (11.22 million) |
| **Delta Agreement** | 6% ($61.37 billion) | ~15% ($10.56 billion) | undisclosed |

\* 8% ($81.8 billion) on Costco co-branded cards and 1% ($10.23 billion) on other AmEx cards used at Costco.

51.    When read in context, the Company's disclosures concerning the Delta Agreement created the false impression that the Costco U.S. Agreement was *less* significant to the Company than the Delta Agreement because—although the Company's revised disclosures explicitly referenced both the Delta Agreement and the Costco U.S. Agreement, the disclosures quantified and disclosed the amount of the Company's business attributable to the former Agreement only and omitted material facts about the even greater amount of the Company's business attributable to the latter. In fact, securities analysts who followed AmEx were actually misled by the Company's disclosures with respect to the Delta Agreement. For example, on September 19, 2014, a Buckingham Research Group analyst estimated the size of the Costco U.S. Agreement, stating that "Costco and Delta Air Lines are among the company's largest co-brand partnerships. *American Express has disclosed that the Delta Skymiles co-brand credit card accounts for 5% of worldwide business. Billed business generated on Costco co-brand cards is likely to be less* . . . ."

52.    *Moreover, because AmEx had not quantified and disclosed the size of the Costco U.S. Agreement for several years, at the beginning of the Class Period in <u>2014</u>, analysts were still using the outdated figures that the Company had disclosed in <u>2008</u> in order to estimate the significance of the Agreement to the Company's financial condition.* See Barclays (Nov. 7, 2014) ("The last time that AXP disclosed the breakdown of its US based lending business in 2Q 2008, Costco loans comprised 14% of AXP's US credit card loan

book."); *see also* Morgan Stanley (Nov. 7, 2014) (basing the size of the Costco Co-Branding Agreement on the 2008 Costco disclosure, stating: "Credit/Charge card % assumptions in-line with Credit card spend as a % of total in the US Costco loans as a % of Amex's US portfolio in line with Amex's 2008 disclosure of 14%").

53.     Thus, during the Class Period, because analysts were using AmEx's **new** disclosures for the Delta Agreement (*i.e.*, 5% of billed business and 15% of loans) but its **old** disclosures for the Costco U.S. Agreement (*i.e.*, 14% of loans), the market had a false impression that the Delta Agreement was more significant to AmEx than the Costco U.S. Agreement when, in fact, the opposite was true. Indeed, as AmEx would later reveal only after the Class Period had ended, the undisclosed Costco portfolio had become substantially **more** significant to AmEx, as it accounted for approximately **9%** of the Company's billed business, and **20%** of its loans in 2014.

**(iv)     Defendants Knew or Were Reckless with Respect to Whether AmEx's Disclosures Concerning the Delta and Costco Co-Brand Agreements Were Misleading**

54.     ***Significantly, Defendant Campbell admitted on a conference call with analysts and investors on January 21, 2015 that the Delta Agreement, which represented 5% of AmEx's billed business, "rises to a level that, from an SEC perspective, we should disclose."*** Specifically, during the Fourth Quarter 2014 AmEx Earnings Call, when an analyst asked Campbell to quantify the percentage of AmEx's reward costs relating to the then-recently renewed Delta Agreement, the following exchange took place:

> **Analyst**: Is it fair then just to add to that the fact that you've got 5% of your spending volume in the co-brand? Because that's not part of the MR program, right? ***That's a disclosure you made in the 10-K, about 5% of your spend is the Delta co-brand***.

> **Campbell**: Yes, you're correct. ***And of course we spell that out in the 10-K because it rises to a level that, from an SEC perspective, we should disclose***.

55.     Because Defendants knew that the Delta Agreement ***"rises to a level that, from an SEC perspective, [AmEx] should disclose,"*** and that the Costco U.S. Agreement was even larger than the Delta Agreement, it follows that Defendants knowingly or recklessly failed to quantify the Costco U.S. Agreement.

**B.      AmEx Loses the Costco Canada Agreement and Learns that Costco Views the Company as Just Another "Vendor"**

56.     On September 17, 2014, Costco announced that beginning in January 2015, Costco's Canadian stores would no longer accept AmEx cards.

57.     Unbeknownst to investors, the nonrenewal of the Costco ***Canada*** Agreement spurred Defendants to initiate early negotiations with Costco concerning the renewal of the Costco ***U.S.*** Agreement, which was not due to expire until March 31, 2016.

58.     According to a source cited in the Wall Street Journal, AmEx's initiation of early negotiations with Costco "prompt[ed] the wholesale club to open up the process to other potential partners." D. Fitzgerald, *Costco Says Split with AmEx Related to Cost*, The Wall Street Journal, Feb. 13, 2015.

59.     During negotiations for the Costco U.S. Agreement, Defendant Chenault called Costco CEO Craig Jelinek to remind him that AmEx had not just furnished Costco with access to its prestigious brand, the Company also had been Costco's "trusted partner." According to people who were briefed by Chenault about the call, Jelinek interrupted Chenault and told him that, as far as he was concerned, Amex was just another "vendor," just like those that sold Costco "ketchup." "If I can get cheaper ketchup somewhere else, I will," he said.

60.     CW1 stated that Costco did not see AmEx as a "partner" and confirmed being a witness to Costco employees stating that AmEx was "just another vendor." CW1 also stated that Defendant Chenault would periodically have conversations with Costco management that would

thereafter "get reported down" from the product management group that directly handled the Costco account.[3] CW1 heard directly from the members of the product management group and others that, during those conversations, Costco management said things along of lines of "you're just another vendor like tires or oatmeal."

61.     Thus, during negotiations for the Costco U.S. Agreement, Defendants knew or were reckless with respect to the significant risk that the Company would lose the Agreement because Costco viewed AmEx as just another vendor, not a "trusted partner," and Costco no longer valued the Company's "premium" cache and the unique value proposition it offered.

## VI.   Defendants' Materially False and Misleading Statements and Omissions During the Class Period

62.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of AmEx common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

---

[3] CW1 worked for American Express in New York from August 1997 until October 2014. During CW1's eighteen years with American Express, CW1 held numerous increasingly responsible positions. Notably, from July 2005 to February 2008, CW1 was Director of Acquisition, Co-Brand Products and worked directly on the Costco co-brand account. After February 2008, CW1 continued to have periodic involvement with the Costco co-brand account and was kept generally aware of developments with that account, which she described as "near and dear to my heart." At the time she left American Express in October of 2014, she held the position of Vice President, Strategic Relationship Management, a position she had held since March 2011.

**A.      Defendants' Material Omissions Pertaining to Known Trends and Uncertainties Concerning the Renewal of the Costco U.S. Agreement**

**1.      Falsity**

63.      Item 303 requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii) & (b).

64.      The SEC has explained, "[o]ne of the most important elements necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results, is the discussion and analysis of known trends, demands, commitments, events and uncertainties." SEC Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A"), Securities Act Release No. 8350, 68 Fed. Reg. 75,056, 75,061 (Dec. 19, 2003) ("2003 SEC Release").

65.      Thus, SEC guidance requires management to make two assessments where a trend or uncertainty is known:

> (1) Is the known trend . . . or uncertainty likely to come to fruition? If management determines that it is *not reasonably likely to occur*, no disclosure is required.

> (2) If management cannot make that determination, it must evaluate objectively the *consequences of the known trend* . . . or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is *not reasonably likely to occur*.

*See* Certain Investment Company Disclosures, Securities Act Release No. 6835, 54 Fed. Reg. 22,427, 22,430 (May 24, 1989) ("1989 SEC Release").

66.     Further, the SEC has made clear for decades that, in addition to the identification of such "known trends or uncertainties," Item 303 specifically requires disclosure of the expected **impact** that any such trends or uncertainties are expected to have on a company's prospective financial performance. The SEC has stated that "Item 303 **require[s] disclosure of forward looking information**," including, at a minimum, disclosure of the "**reasonably likely material effects on operating results**." 1989 SEC Release at 22,428-29.

67.     Here, Defendants failed to disclose known trends and uncertainties, as required by Item 303. First, Defendants failed to disclose a known uncertainty with respect to the renewal of the Costco U.S. Agreement, given the fact that AmEx had initiated early renewal negotiations with Costco and Costco had solicited competing bids from other parties, and the expected impact of that uncertainty. Second, Defendants failed to disclose a known uncertainty concerning the renewal of the Costco U.S. Agreement in light of Costco's position that AmEx was just another "vendor," and the expected impact of that uncertainty. Third, Defendants disclosed a known trend of increased competition with respect to co-brand agreements in general, but Defendants failed to quantify and disclose the expected impact of that trend, as required by Item 303.

> **(a)     Defendants' Failure to Disclose the Expected Impact of a Known Trend Concerning the Increasingly Intense Competition for Co-Brand Agreements**

68.     On July 30, 2014, AmEx filed its Form 10-Q for quarterly period ended June 30, 2014 (the "2Q'14 10-Q"). In that statement, AmEx characterized the competition for co-brand agreements as "increasingly intense." In addition to disclosing the risk of losing co-brand partners, AmEx also disclosed the risk that "existing relationships will be renegotiated with less favorable terms for us as competition for such relationships increases."[4]

---

[4] The "Risk Factors" contained in AmEx's Form 10-K for fiscal year ended December 31, 2013 (the "2013 10-K") and the 2Q'14 10-Q were incorporated by reference into the 3Q'14 10-Q,

69.     However, rather than provide the required disclosures under Item 303 concerning the extent of the expected impact of this trend, Defendants utterly failed to provide any disclosure of what was at stake.

> **(b)     Defendants' Failure to Disclose a Known Uncertainty Concerning the Renewal of the Costco U.S. Agreement and the Expected Impact of Nonrenewal on AmEx's Financial Condition**

70.     Under the SEC's rubric for disclosure under Item 303—in light of Costco's position that AmEx was just another "vendor," the nonrenewal of the Costco Canada Agreement and the Company's decision to initiate early negotiations with Costco concerning the renewal of the Costco U.S. Agreement, which caused Costco to solicit competitive bids from other parties— the Company was required to disclose the known uncertainty that the Costco U.S. Agreement likewise may not be renewed. Similarly, Defendants failed to disclose a known uncertainty concerning the renewal of the Costco U.S. Agreement in light of Costco's position that AmEx was just another "vendor,"

71.     Indeed, under the SEC's guidance, the "likely nonrenewal of a material contract" is listed as an example of a known uncertainty that is required to be disclosed in the company's quarterly financial statements.[5]

72.     Significantly, even if AmEx was simply uncertain as to whether the Costco U.S. Agreement would be renewed, under the applicable test for disclosure under Item 303, the Company was required to evaluate and disclose the impact that nonrenewal would have on its

---

which was filed with the SEC shortly after AmEx lost the Costco Canada Agreement. The 3Q'14 10-Q further stated, "There are no material changes from the risk factors set forth in the [2013 10-K], as supplemented and updated in the [2Q'14] 10-Q."

[5] 1989 SEC Release at 22,429.

financial condition, and could avoid disclosure only if it concluded that "a material effect . . . is **not** reasonably likely to occur."[6]

73.     No later than September 17, 2014, when AmEx failed to renew the Costco Canada Agreement, Defendants knew that there was an uncertainty as to whether the Costco U.S. Agreement would be renewed and that it was reasonably likely that the Company would suffer a material adverse impact on its financial condition as a result of the nonrenewal of the Agreement because:

- Costco's decision to terminate the Costco Canada Agreement and select MasterCard and Capital One to replace AmEx as its co-brand partners showed that Costco was willing to switch co-brand partners to obtain a lower price for the Costco U.S. Agreement.

- The loss of the Costco Canada Agreement spurred Defendants to initiate early negotiations on the Costco U.S. Agreement, the outcome of which was uncertain at best.

- CW1 stated that Costco did not see AmEx as a "partner" and told the Company that it was "just another vendor" like the vendors that sold Costco tires or oatmeal. In other words, if Costco was able to secure a lower price (*i.e.*, discount rate) by switching to another provider, it would do so.

74.     Thus, after the loss of the Costco Canada Agreement, Defendants were required to disclose this known uncertainty no later than October 28, 2014, when AmEx filed with the SEC its Form 10-Q interim financial report for the quarter ending September 30, 2014 (the "3Q'14 10-Q").[7] However, Defendants failed to disclose it, in violation of Item 303.

75.     Moreover, Defendants knew of the significance of the Costco U.S. Agreement to AmEx, and the material adverse impact its loss would have on the Company's financial

---

[6] 1989 SEC Release at 22,430.

[7] The 3Q'14 10-Q was signed by Defendant Chenault and Defendant Campbell.

condition. However, in violation of Item 303, Defendants failed to disclose the expected impact or quantify it in any way.

### 2.   Scienter

76.   The following additional facts establish Defendants' scienter with respect to their material omissions pertaining to known trends and uncertainties concerning the renewal of the Costco U.S. Agreement:

(a)   CW1 confirmed that Costco employees told her that AmEx was "just another vendor" and that Costco management told Defendant Chenault "you're just another vendor like tires or oatmeal." CW1's statements are consistent with a *Bloomberg* media report, which stated that, during the Class Period, Costco CEO Jelinek told Chenault that, as far as he was concerned, AmEx was just another "vendor," just like those that sold Costco ketchup, and, "If I can get cheaper ketchup somewhere else, I will." Indeed, by September 17, 2014, Costco had already followed through on its threats to replace AmEx with a co-brand partner that could offer lower pricing when it terminated the Costco Canada Agreement in favor of a co-brand agreement with MasterCard.

(b)   Defendant Chenault admitted on February 12, 2015, that Defendants had initiated early negotiations with Costco concerning the renewal of the Costco U.S. Agreement "well in advance of [the] contract expiration." Further, Chenault stated that the Company did so "knowing that it could have a near term financial impact . . . ."

(c)   Defendants clearly knew of and disclosed the known trend of substantial and increasingly intense competition for co-brand partners. Demonstrated by AmEx's correspondence with the SEC in 2012 regarding the Delta Agreement, which was addressed and copied to Defendant Chenault, and the "Risk Factor" warnings concerning increased competition for co-brand agreements contained in the Company's SEC filings.

(d)      The size and significance of the Costco U.S. Agreement supports the inference that Defendants tracked its magnitude during the Class Period.

(e)      Defendants knew that the Costco U.S. Agreement was much more significant to AmEx than the Delta Agreement, and that the SEC had requested that AmEx quantify its exposure to the Delta Agreement. Indeed, on a conference call with analysts and investors on January 21, 2015, on which Defendant Chenault also participated, Defendant Campbell admitted that the Delta Agreement, which represented 5% of AmEx's billed business, "rises to a level that, from an SEC perspective, we should disclose."

**B.    Defendants' Materially False and Misleading Statements Quantifying and Disclosing the Significance of the Delta Agreement but Not the Costco U.S. Agreement**

**1.    Falsity**

77.    Defendants created the false impression that the Delta Agreement was more significant to AmEx than the Costco U.S. Agreement by repeatedly quantifying and disclosing the significance of the former in the Company's SEC filings while omitting the material fact that the latter was even more significant to the Company.

78.    The following misleading statement was incorporated into the 3Q'14 10-Q[8]:

We have agreements with business partners in a variety of industries, including the airline industry, that represent a significant portion of our business. We are exposed to risks associated with these industries, including bankruptcies, liquidations, restructurings, consolidations and alliances of our partners, and the possible obligation to make payments to our partners. We also face substantial and increasingly intense competition for partner relationships, which could result in a loss or renegotiation of these arrangements that could have a material adverse impact on our business and results of operations.

---

[8] AmEx incorporated the risk factors from both the 2013 10-K and the 2Q'14 10-Q into its 3Q'14 10-Q. The 3Q'14 10-Q further stated, "There are no material changes from the risk factors set forth in the [2013 10-K], as supplemented and updated in the [2Q'14] 10-Q."

In the ordinary course of our business we enter into different types of contractual arrangements with business partners in a variety of industries. ***For example, we have partnered with Costco and Delta Air Lines to offer co-branded cards for consumers and small businesses***, and through our Membership Rewards program we have partnered with businesses in many industries, including the airline industry, to offer benefits to Card Member participants. Competition for relationships with key business partners is very intense and there can be no assurance we will be able to grow or maintain these partner relationships. We face the risk that we could lose partner relationships, even after we have invested significant resources, time and expense in acquiring and developing the relationships, which could result in Card Member attrition or additional costs to retain Card Members. We also face the risk that existing relationships will be renegotiated with less favorable terms for us as competition for such relationships increases. The loss of business partners or the renegotiation of existing relationships with terms that are significantly worse for us could have a material adverse impact on our business and results of operations . . . .

***The airline industry represents a significant portion of our billed business and in recent years has undergone bankruptcies, restructurings, consolidations and other similar events. The airline industry accounted for approximately 10 percent of our worldwide billed business for the six months ended June 30, 2014*** . . . .

***Our largest airline co-brand loan portfolio, American Express' Delta SkyMiles Credit Card, accounted for less than 15 percent of worldwide Card Member loans as of June 30, 2014*** . . . .

79.    Defendants also quantified and disclosed the amount of AmEx's business attributable to the Delta Agreement in the Company's 2013 10-K, which was also incorporated into the 3Q'14 10-Q, stating that the "Delta SkyMiles Credit Card co-brand portfolio accounts for **approximately 5 percent of the Company's worldwide billed business and less than 15 percent of worldwide Cardmember loans**."

80.    These statements were materially false and misleading because, even assuming they were literally true with respect to the amount of AmEx's business that was attributable to the Delta Agreement, they omitted material facts and created a false impression in context. Specifically, because Defendants quantified and disclosed AmEx's exposure to the Delta Agreement but omitted the material fact that the Costco U.S. Agreement was even more

significant to the Company, a reasonable investor, in the exercise of due care, would have believed that the Company's exposure to the former was more significant than its exposure to the latter, when, in fact, the opposite was true. Indeed, by the third quarter of 2014, the Costco U.S. Agreement (9% of billed business) was nearly the same size as all of AmEx's airline industry co-brand agreements **combined** (10% of billed business).

### 2. Scienter

81.     The following additional facts establish Defendants' scienter with respect to their materially false and misleading statements quantifying and disclosing the significance of the Delta Agreement but not the Costco U.S. Agreement:

(a)     The size and significance of the Costco U.S. Agreement supports the inference that Defendants tracked its magnitude during the Class Period.

(b)     Defendants knew that the Costco U.S. Agreement was much more significant to AmEx than the Delta Agreement, and that the SEC had requested that AmEx quantify its exposure to the Delta Agreement. Indeed, on a conference call with analysts and investors on January 21, 2015, on which Defendant Chenault also participated, Defendant Campbell admitted that the Delta Agreement, which represented 5% of AmEx's billed business, "rises to a level that, from an SEC perspective, we should disclose."

(c)     Defendants knew of or recklessly disregarded widely disseminated analyst reports that grossly underestimated the size of the Costco U.S. Agreement, based on AmEx's prior inconsistent disclosures concerning that Agreement and the Delta Agreement.

C.   **Defendants' Material Omissions Concerning the Renewal of the Costco U.S. Agreement and the Magnitude of the Potential Impact of Nonrenewal on AmEx's Financial Condition**

1.   **Falsity**

82.   Defendants failed to disclose material adverse facts concerning the Costco U.S. Agreement, which, by September 17, 2014, Defendants had a duty to disclose in light of the risk that Defendants would secure the renewal of the Agreement and the magnitude of the potential impact of nonrenewal on AmEx's financial condition. Specifically, in light of Defendants' misleading statements concerning the significance of the Delta Agreement, Defendants failure to disclose the following adverse facts was misleading: that the nonrenewal of the Costco Canada Agreement had already spurred Defendants to initiate early negotiations with Costco concerning the renewal of the Costco U.S. Agreement; that, as a result of the Company's early initiation of negotiations, Costco had solicited competing bids from other parties; and that the outcome of those negotiations would have a material adverse "near-term financial impact" on AmEx. *None of this was disclosed to investors until the end of the Class Period*.

2.   *Scienter*

83.   The following additional facts establish Defendants' scienter with respect to their omissions concerning the renewal of the Costco U.S. Agreement and the magnitude of the potential impact of nonrenewal on AmEx's financial condition:

(a)   CW1 confirmed that Costco employees told her that AmEx was "just another vendor" and that Costco management told Defendant Chenault "you're just another vendor like tires or oatmeal." CW1's statements are consistent with a *Bloomberg* media report, which stated that, during the Class Period, Costco CEO Jelinek told Chenault that, as far as he was concerned, AmEx was just another "vendor," just like those that sold Costco ketchup, and, "If I can get cheaper ketchup somewhere else, I will." Indeed, by September

17, 2014, Costco had already followed through on its threats to replace AmEx with a co-brand partner that could offer lower pricing when it terminated the Costco Canada Agreement in favor of a co-brand agreement with MasterCard.

      (b)    Defendant Chenault admitted on February 12, 2015, that Defendants had initiated early negotiations with Costco concerning the renewal of the Costco U.S. Agreement "well in advance of [the] contract expiration." Further, Chenault stated that the Company did so "knowing that it could have a near term financial impact . . . ."

      (c)    The size and significance of the Costco U.S. Agreement supports the inference that Defendants tracked its magnitude during the Class Period.

**D.    Defendants' Materially False and Misleading Statements Concerning the Renewal of the Costco U.S. Agreement and the Magnitude of the Potential Impact of Nonrenewal on AmEx's Financial Condition**

      **1.    Falsity**

84.    Defendants made materially false and misleading statements concerning the renewal of the Costco U.S. Agreement that concealed the material adverse facts that the nonrenewal of the Costco Canada Agreement had already spurred Defendants to initiate early negotiations with Costco concerning the renewal of the Costco U.S. Agreement; that, as a result of the Company's early initiation of negotiations, Costco had solicited competing bids from other parties; and that the outcome of those negotiations would have a material adverse "near-term financial impact" on AmEx.

85.    Specifically, on January 21, 2015, after the close of trading, AmEx issued a press release announcing its financial results for the fourth quarter and full year of 2014, the period ended December 31, 2014. For the fourth quarter, the Company reported net income of $1.4 billion and diluted earnings per share of $1.39 per share (up 15 percent from the previous year).

- 30 -

86.     Later that afternoon, AmEx held a conference call with investors and analysts to discuss the Company's earnings results and operations. During the conference call, Defendant Campbell was asked directly about the Costco U.S. Agreement. The following exchange took place:

> **Analyst**: Yes, Jeff, I was wondering if you could give us your thoughts on when we might hear on the Costco U.S. deal and if you could talk a little bit around that, how you balance what appear to be lighter economics on these co-brand deals with the potential lumpiness of a loss of a deal, how you think through that.

> **Campbell**: Well, I appreciate the question. Costco is a very important and long-term partner of ours. Our U.S. relationship goes back to the 1990s. We think we've been great partners and have created a lot of value for their members, our Card Members and for both companies. ***I would point out to you that I don't think we've said anything about any ongoing discussions we're having with Costco. Obviously, with very important partners we are always working every day to evolve the relationship to make it better and frankly to make sure it's working for both parties. You can presume we're doing that with Costco as we're doing it with all of our partners at any time and if and when we have any news as we did with Delta, which we chose to renew early, we would certainly tell you***.

87.     These statements were materially false and misleading because they represented that there were no active, ongoing negotiations with Costco concerning the Costco U.S. Agreement. Specifically, Defendant Campbell lied to the market when he stated that there were no negotiations other than the "every day" contacts that AmEx was "doing [] with all of our partners at any time." And Campbell's statement that "if and when we have news, as we did with Delta which we chose to renew early, we will certainly tell you" misleadingly signaled that the Company had ***not*** initiated early negotiations with Costco concerning the renewal of the Costco U.S. Agreement (when, in fact, it had), and that the renewal of the Costco U.S. Agreement (as had then-recently occurred with respect to the Delta Agreement) was on the horizon. By not disclosing the material adverse fact that the nonrenewal of the Costco Canada Agreement had already spurred Defendants to initiate early negotiations with Costco concerning the renewal of

the Costco U.S. Agreement, and that the loss of that Agreement would have a material adverse "near-term financial impact" on AmEx, investors were misled about the actual risk posed to the Company's financial condition by the potential loss of the Agreement.

### 2.   Scienter

88.   The following additional facts establish Defendants' scienter with respect to their false and misleading statements concerning the renewal of the Costco U.S. Agreement and the magnitude of the potential impact of nonrenewal on AmEx's financial condition:

(a)   Defendant Chenault admitted on February 12, 2015, that Defendants had initiated early negotiations with Costco concerning the renewal of the Costco U.S. Agreement "well in advance of [the] contract expiration." Further, Chenault stated that the Company did so "***knowing*** that it could have a near term financial impact . . . ."

(b)   CW1 confirmed that Costco employees told her that AmEx was "just another vendor" and that Costco management told Defendant Chenault "you're just another vendor like tires or oatmeal." CW1's statements are consistent with a *Bloomberg* media report, which stated that, during the Class Period, Costco CEO Jelinek told Chenault that, as far as he was concerned, AmEx was just another "vendor," just like those that sold Costco ketchup, and, "If I can get cheaper ketchup somewhere else, I will." Indeed, by September 17, 2014, Costco had already followed through on its threats to replace AmEx with a co-brand partner that could offer lower pricing when it terminated the Costco Canada Agreement in favor of a co-brand agreement with MasterCard.

(c)   The size and significance of the Costco U.S. agreement supports the inference that Defendants tracked its magnitude during the Class Period.

E.   **Defendants' Materially False and Misleading Statements Contrasting the Costco Canada Agreement and the Costco U.S. Agreement, Which Defendants Had a Duty to Update**

1.   **Falsity**

89.   Defendants made reassuring statements contrasting the Costco Canada Agreement with the Costco U.S. Agreement, which Defendants had a duty to update when they subsequently became materially false and misleading because, upon the nonrenewal of the Costco Canada Agreement, the Company had initiated early negotiations with Costco concerning the renewal of the Costco U.S. Agreement, thereby causing Costco to solicit competing bids from other parties.

90.   On the morning of September 18, 2014, *Bloomberg* reported on the loss of the Costco Canada Agreement in an article titled *Costco Stores in Canada to Stop Taking American Express*. *Bloomberg* quoted the Vice President of Communications for American Express Canada ("AmEx Canada"),[9] as stating: "The terms of the contract was [*sic*] up, AmEx and Costco entered into negotiations and were unable to come to terms. . . . ***This is very specific and exclusive to Canada. There are separate contracts for AmEx's U.S. Costco Relationship***."

91.   On October 15, 2014, after the close of trading, AmEx issued a press release announcing its financial results for the third quarter of 2014, for the period ended September 30, 2014.

92.   Later that night, AmEx held a conference call with analysts and investors to discuss the Company's earnings release and operations. During the conference call, Defendant Campbell discussed the loss of the Costco Canada Agreement and emphasized that AmEx had a separate contract with Costco U.S. stating, in pertinent part, as follows:

> I'll note that ***we have separate agreements with Costco in each of the several markets where we maintain a partnership, and have a longer and more***

---

[9] AmEx Canada is a wholly-owned subsidiary of AmEx.

*significant relationship with Costco in the US, dating back over 15 years.* As with any long-term partnership, *we work with Costco on an ongoing basis to find ways to drive value for both parties going forward,* never losing sight of the fact that we are serving the same customers.

93.     By underscoring the historical strength of the Costco U.S. Agreement and setting it apart from the failed Costco Canada Agreement, Defendants downplayed the risk of losing the Costco U.S. Agreement. Defendants' downplaying this risk subsequently became materially misleading because it concealed the material adverse facts that, subsequent to making the above misstatements, the nonrenewal of the Costco Canada Agreement spurred Defendants to initiate early negotiations with Costco concerning the renewal of the Costco U.S. Agreement, thereby causing Costco to solicit competitive bids from other parties, and that nonrenewal of the Agreement would have a material adverse "near-term financial impact" on AmEx.

### 2.     Scienter

94.     The following additional facts establish Defendants' scienter with respect to their false and misleading statements contrasting the Costco Canada and Costco U.S. Agreements:

(a)     CW1 confirmed that Costco employees told her that AmEx was "just another vendor" and that Costco management told Defendant Chenault "you're just another vendor like tires or oatmeal." CW1's statements are consistent with a *Bloomberg* media report, which stated that, during the Class Period, Costco CEO Jelinek told Chenault that, as far as he was concerned, AmEx was just another "vendor," just like those that sold Costco ketchup, and, "If I can get cheaper ketchup somewhere else, I will." Indeed, by the start of the Class Period, Costco had already followed through on its threats to replace AmEx with a co-brand partner that could offer lower pricing when it terminated the Costco Canada Agreement in favor of a co-brand agreement with MasterCard.

(b)     Defendant Chenault admitted on February 12, 2015, that Defendants initiated early negotiations with Costco concerning the renewal of the Costco U.S. Agreement "well in advance of [the] contract expiration." Further, Chenault stated that the Company did so "***knowing*** that it could have a near term financial impact . . . ."

(c)     The size and significance of the Costco U.S. agreement supports the inference that Defendants tracked its magnitude during the Class Period.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS RELEVANT TO ALL CLAIMS

95.     As alleged herein, AmEx and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts concerning AmEx, their control over, and/or receipt and/or modification of AmEx's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning AmEx, participated in the fraudulent scheme alleged herein.

96.     Because the Costco U.S. Agreement was AmEx's largest co-brand agreement, comprising approximately ***9%*** of all of the Company's worldwide billed business and ***20%*** of worldwide accounts receivable for the year ended December 31, 2014, it represented a core operation of the Company, and it is likely that the Individual Defendants and other officers of the Company were closely tracking the underlying metrics of the Agreement and the renegotiation process.

97.     The knowledge and intent of the Individual Defendants are imputed to AmEx. The same is true for other AmEx officials, whether or not they are named as Defendants herein.

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

98.     On February 12, 2015, before the opening of trading, AmEx issued a press release entitled "American Express and Costco U.S. Partnership Agreements Set to End March 31, 2016." The release quoted Defendant Chenault stating, in pertinent part, that AmEx had "began discussions on a possible renewal with Costco well in advance of [the] contract expiration," but that the Company had been "unable to reach terms that would have made economic sense," and that after March 31, 2016, AmEx cards would no longer be accepted at Costco.

99.     Shortly after the issuance of the press release, AmEx held a conference call with analysts and investors to discuss the nonrenewal of the Costco U.S. Agreement and related issues. At the start of the call, Defendant Chenault acknowledged that the nonrenewal of the Agreement would have a "negative impact on earnings and revenue growth in 2015 and 2016." Chenault further stated that AmEx had initiated early negotiations with Costco concerning the renewal of the Agreement "knowing that it could have a near-term financial impact" on the Company. Defendant Campbell, for the first time, detailed the impact of the nonrenewal, stating, in pertinent part, as follows:

> As Ken said, we intend to work to offer value propositions that our card members from the Costco relationship will find appealing while also pursuing our many other growth opportunities, both of which will entail additional marketing dollars. ***The cumulative effect of all of these changes will have a significant impact on our 2015 and 2016 results.***
>
> . . .
>
> ***As all of these items play out over the next two years, we will likely have more unevenness in our performance from quarter to quarter than has been typical of our business. Looking beyond 2016, we believe that our 12% to 15% EPS growth target remains appropriate beginning again in 2017, which really will***

- 36 -

*be the first period where growth rates are not impacted by Costco U.S. and our other co-brand partner renewals.*

*. . .*

*First for context, in 2014 the Costco U.S. co-brand was approximately 8% of our worldwide billed business with over 70% of the spending on the product occurring outside of Costco warehouses. The Costco U.S. co-brand's portfolio makes up about 20% of worldwide loans and about 10% of worldwide cards in force. In addition, about another 1% of our worldwide billings come from other American Express Card members spending at Costco.*

We could begin to see a modest slowdown in billings, loans and revenue growth associated with the Costco U.S. co-brand over the course of 2015, and we would expect this slowdown to increase as we near the end of the contract.

100.     In response to the nonrenewal of the Costco U.S. Agreement and the disclosure of the financial impact of the nonrenewal, the price of AmEx stock declined from a high of $81.53 per share on February 12, 2015, to close at $78.08 per share on February 13, 2015, on extremely heavy trading volume.

101.     The market reacted with surprise at the fact that Amex failed to renew the Costco U.S. Agreement.[10] Moreover, following the Company's February 12, 2015 announcement, analysts expressed shock at the materiality of the loss of the Agreement to AmEx's financial results, and the consequences associated with its nonrenewal. For example, *Barclays Equity Research* noted that the "proportion of business generated by the Costco co-brand relationship, [] was **much more significant** than we had previously estimated." Likewise, *Evercore ISI* issued a report noting that it was **"bigger than expected."** *RBC Capital Markets* called the Agreement AmEx's "crown jewel" and highlighted the fact that the "**magnitude of the [Costco U.S. Agreement] was previously undisclosed, but is also very sizable."**

---

[10]   As noted by J.P. Morgan, "consensus estimates implicitly assumed renewal" of the Agreement. J.P. Morgan, North American Equity Research, *American Express: Model Update on Costco Contract Loss* at 1 (Feb. 13, 2015).

102.     Analysts also discussed the far-reaching implications of this news on the Company's continuing operations. For instance, *RBC Capital Markets* advised that the nonrenewal of the Costco U.S. Agreement "clearly has meaningful earnings implications" and explained that the Company would have to undertake "aggressive marketing efforts attempting to fill the gap" that was created by the loss of the Agreement.

103.     Further reflecting the severity of the adverse impact of the nonrenewal of the Costco U.S. Agreement, on or about February 18, 2015, corporate debt rater Moody's issued a ratings report entitled "Costco Loss Is Credit Negative for American Express' Card ABS." In that vein, a Fitch ratings report issued on or about February 18, 2015 also found that the loss of the Costco U.S. Agreement added earnings pressure to AmEx's existing near-term challenges.

104.     The market's surprise at the materiality of the Costco U.S. Agreement is further demonstrated by the disconnect between analysts' modeling of the financial impact of the contract before and after the February 12, 2015 disclosure. For instance, on average, analysts estimated that the Costco U.S. Agreement represented approximately 3% of AmEx's total billed business (approximately $30 billion). As set forth below, ***the actual impact on billed business was more than 200% of the average of analysts' modeling before February 12, 2015.***

| Percentage of AmEx's Worldwide Spend | | | |
|---|---|---|---|
| **Analyst** | **Estimates prior to Corrective Disclosure** | **Actual Costco US Impact Disclosed** | **% Difference Between Actual and Estimates** |
| Credit Suisse | ~3% of total spend | 8% of worldwide spend | ~250% |
| Barclays | ~2.2% of total spend | 8% of worldwide spend | ~350% |
| Morgan Stanley | ~3% of total spend | 8% of worldwide spend | ~250% |
| Buckingham Research Grp. | ~3% of total spend | 8% of worldwide spend | ~250% |
| Susquehanna Financial Grp. | ~3-5% of total spend | 8% of worldwide spend | ~250% |
| Citigroup | ~4% of total spend | 8% of worldwide spend | ~200% |
| Portales Partners | ~2.5% of total spend | 8% of worldwide spend | ~300% |

105.   Three analysts estimated the impact that the Costco U.S. Agreement would have on AmEx's worldwide credit loans. ***The actual impact was, on average, approximately 150% higher than what analysts were modeling before February 12, 2015.***[11]

| Percentage of AmEx's Worldwide Credit Loan | | | |
|---|---|---|---|
| **Analyst** | **Estimates prior to Corrective Disclosure** | **Actual Costco US Impact Disclosed** | **% Difference Between Actual and Estimates** |
| Barclays | ~14% | ~20% | ~140% |
| Morgan Stanley | ~13-16% | ~20% | ~150% |
| Buckingham Research Grp. | ~12% | ~20% | ~160% |

106.   Additionally, once AmEx announced the actual impact of losing that Agreement, analysts revised their EPS downward by an average of $0.44 for 2015 and $0.82 for 2016.

---

[11] Two of the analysts only estimated the Costco U.S. loans as a percentage of AmEx's U.S. loan book. Thus, it can reasonably be inferred that the estimated percentage of Costco U.S. loans as a percentage of AmEx's worldwide loan would be even lower.

- 39 -

| EPS Revisions To Reflect Loss of the Costco U.S. Agreement | | | | | |
|---|---|---|---|---|---|
| | **2015** | | | **2016** | |
| **Analysts** | **Original** | **Revised** | **Change** | **Original** | **Revised** | **Change** |
| Credit Suisse | $5.55 | $5.35 | -$0.20 | $5.90 | $5.50 | -$0.40 |
| Barclays | $6.03 | $5.48 | -$0.55 | $6.46 | $5.56 | -$0.90 |
| Morgan Stanley | $5.95 | $5.55 | -$0.40 | $6.75 | $6.01 | -$0.74 |
| Buckingham Research | $5.99 | $5.50 | -$0.49 | $6.80 | $5.95 | -$0.85 |
| William Blair | $6.00 | $5.50 | -$0.50 | $6.70 | $5.55 | -$1.15 |
| Wells Fargo | $6.00 | $5.55 | -$0.45 | $6.65 | $5.75 | -$0.90 |
| Sandler O'Neill & Partners | $5.90 | $5.55 | -$0.35 | $6.73 | $5.77 | -$0.96 |
| Janney Capital Markets | $5.65 | $5.41 | -$0.24 | $6.33 | $5.86 | -$0.47 |
| UBS | $5.76 | $5.55 | -$0.21 | $6.15 | $5.65 | -$0.50 |
| Piper Jaffray | $6.10 | $5.50 | -$0.60 | $6.70 | $5.80 | -$0.90 |
| Macquarie Research | $5.64 | $5.42 | -$0.22 | $6.56 | $5.74 | -$0.82 |
| Evercore ISI | $6.05 | $5.50 | -$0.55 | $6.60 | $5.85 | -$0.75 |
| Jefferies | $5.93 | $5.50 | -$0.43 | $6.51 | $5.65 | -$0.86 |
| Oppenheimer | $5.75 | $5.42 | -$0.33 | $6.50 | $5.65 | -$0.85 |
| JP Morgan | $6.04 | $5.52 | -$0.52 | $6.51 | $5.67 | -$0.84 |
| RBC Capital Markets | $5.60 | $5.27 | -$0.33 | $5.95 | $5.40 | -$0.55 |
| Burke & Quick Partners | $6.00 | $5.47 | -$0.53 | $6.80 | $5.90 | -$0.90 |
| Guggenheim | $6.15 | $5.10 | -$1.05 | $6.65 | $5.30 | -$1.35 |
| **Averages:** | | | **-$0.44** | | | **-$0.82** |

107.    The market for AmEx common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and omissions as set forth above, AmEx common stock traded at artificially inflated prices during the Class Period. Lead Plaintiff and other members of the Class purchased or otherwise acquired AmEx common stock relying upon the integrity of the market price of AmEx common stock and market information relating to AmEx, and have been damaged thereby.

108.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause, of the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about AmEx's business, prospects, and operations. These material misstatements and omissions had the cause and effect of creating, in the market, an

unrealistically positive assessment of AmEx and its business, prospects, and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing AmEx common stock at artificially inflated prices, thus causing the damages complained of herein. When the true facts about the Company were revealed to the market, the inflation in the price of AmEx common stock was removed and the price of AmEx common stock declined dramatically, causing losses to Lead Plaintiff and the other members of the Class.

## IX.    MATERIALITY

109.   The Costco U.S. Agreement was both quantitatively and qualitatively material.

110.   As to quantitative materiality, the Costco U.S. Agreement generated approximately *8%* of AmEx's worldwide billed business with more than 70% of the spending on Costco co-branded cards occurring outside Costco warehouses (another 1% of worldwide billings was generated by other American Express cardholder' spending at Costco). The Costco U.S. Agreement also accounted for *20%* of the Company's worldwide loans and *10%* of its cards in force.

111.   The following chart depicts the importance of the U.S. Costco co-branding agreement to AmEx for 2014:

|  | Costco U.S. | AmEx Total | % |
|---|---|---|---|
| Billed Business | $92.03 billion | $1,022.85 billion | *9%* |
| Loans | $14.08 billion | $70.4 billion | *20%* |
| Cards in Force | $11.22 million | $112.2 million | *10%* |

112.    Moreover, after the corrective disclosures at the end of the Class Period, analysts estimated that the Costco U.S. Agreement accounted for **8%** or more of AmEx's revenues.[12]

113.    As to qualitative materiality, the Costco U.S. Agreement represented AmEx's largest co-brand agreement, which an analyst with RBC Capital Markets referred to as "***one of the crown jewels of co-brand relationships***."[13]

## X.    POST-CLASS PERIOD DEVELOPMENTS

114.    Shortly after February 12, 2015, when Defendants shocked the market by disclosing the loss and size of the Costco U.S. Agreement, AmEx revised the risk factors that the Company disclosed in its financial reports concerning the trend of increased competition for co-brand partners.

115.    On February 24, 2015, in AmEx's Form 10-K for fiscal year ended December 31, 2014 (the "2014 10-K"), Defendants quantified and disclosed, for the first time, the significance of the Company's co-brand partnerships to its financial condition in terms of both billed business and worldwide loans. Instead of merely disclosing the generic trend that competition for co-brand partners was "substantial and increasingly intense," AmEx also stated:

> Our cobrand portfolio accounted for less than ***25 percent*** of our worldwide billed business for the year ended December 31, 2014 and less than ***50 percent*** of our

---

[12] *See, e.g.*, Buckingham Research Group, American Express: Revising Outlook to Reflect Loss of Costco Partnership, Other Challenges, (Feb. 12, 2015) (8% of revenues); Credit Suisse, American Express: Amex and Costco US to End Partnership, Decrease TP to $78 (Feb. 12, 2015) (8.8% of revenues, calculated by adding the figures for "Revenues from Spend Associated with Costco" (1,851) and "Lost NII from Loans Associated with Costco" (1,126) listed in Exhibit 2, and dividing by the figure for AmEx's 2014 annual revenue on page 1 (33,573.0)).

Notably, during the Class Period, analysts attributed much lower revenue figures to the Costco U.S. Agreement. *See, e.g.*, Barclays, American Express: Estimating the Earnings Impact of an AmEx/Costco Divorce, (Nov. 7, 2014) (approximately 3.3% of revenues); Susquehanna, American Express Company: Quantifying Risk from the Costco Partnership, (Nov. 26, 2014) (approximately 0.5% of revenues.)

[13] *Bloomberg*, "AmEx Costco Card Seen as Crown Jewel Worth 15 Cents EPS" (Nov. 10, 2014).

worldwide Card Member loans as of December 31, 2014. The volume of billed business and Card Member loans generated by our cobrand portfolio could decline significantly, including as a result of the termination of one or more cobrand arrangements.

116.    AmEx also disclosed that the "loss of business partners (whether by non-renewal at the end of the contract period or early termination) or the renegotiation of existing relationships with terms that are significantly worse for us could have a ***material adverse impact*** on our business and results of operations," listing the Company's loss of the Costco U.S. Agreement as an example.

## XI.    NO SAFE HARBOR

117.    The "Safe Harbor" warnings accompanying AmEx's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability. To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with GAAP, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor. *See* 15 U.S.C. §78u-5(b)(2)(A).

118.    Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of AmEx who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

- 43 -

**XII.   APPLICATION OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET** Lead Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine in that, among other things:

(a)   Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   AmEx common stock traded in an efficient market;

(d)   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of AmEx common stock; and

(e)   Lead Plaintiff and other members of the Class purchased AmEx common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

120.   At all relevant times, the market for AmEx common stock was efficient.

**XIII.  APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**   *AFFILIATED UTE* DOCTRINE**

121.   Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because Defendants' material omissions during the Class Period caused harm to Lead Plaintiff and the Class.

122.   Because the Complaint alleges Defendants' failure to disclose material adverse information concerning AmEx's business operations, financial results and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense

that a reasonable investor might have considered them important in making investment decisions.

123.    Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

## XIV.   CAUSES OF ACTION

### <u>FIRST CAUSE OF ACTION</u>

**For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
with Respect to Material Omissions Pertaining to Known Trends and Uncertainties
Concerning the Renewal of the Costco U.S. Agreement
<u>(Against All Defendants)</u>**

124.    Lead Plaintiff incorporates by reference and reallege ¶¶ 1-123 as fully set forth herein.

125.    This cause of action is brought by Lead Plaintiff under Section 10(b) of the Exchange Act and SEC Rule 10b-5 against all Defendants.

126.    During the Class Period, these Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

127.    The Defendants named in this Cause of Action violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud

or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of AmEx common stock during the Class Period.

128.    Specifically, in AmEx's 2Q'14 10-Q, Defendants characterized the competition for co-brand agreements as "increasingly intense" and disclosed the risk that "existing relationships will be renegotiated with less favorable terms for us as competition for such relationships increases." However, Defendants failed to disclose the extent of the expected impact of "increasingly intense" co-brand competition, in violation of Item 303, which required AmEx to quantify the potential impact of the trend on the company's financial condition.

129.    Defendants also failed to disclose a known uncertainty concerning the renewal of the Costco U.S. Agreement and the expected impact of nonrenewal on AmEx's financial condition. No later than September 17, 2014, when AmEx failed to renew the Costco Canada Agreement, Defendants knew that there was uncertainty as to whether the Costco U.S. Agreement would be renewed and that it was reasonably likely that AmEx would suffer a material adverse impact on its financial condition as a result of the nonrenewal of the Agreement. At the time, AmEx was aware that Costco viewed AmEx as just another "vendor" like the vendors that sold Costco ketchup, tires, or oatmeal, and was only focused on price. Defendants also knew that when AmEx lost Costco Canada to MasterCard, Costco was willing to switch co-brand partners for a lower price. Moreover, Defendants knew of the significance of the Costco U.S. Agreement to AmEx and the material adverse "near-term financial impact" its loss would have on the Company. In addition, Defendants knew that the nonrenewal of the Costco Canada Agreement had spurred AmEx to initiate early negotiations with Costco concerning the renewal of the Costco U.S. Agreement, and that Costco had solicited competing bids from other parties.

130.   Defendants failed to disclose the known uncertainty of losing the Costco U.S. Agreement and the expected impact of its loss to the company's financial condition, in violation of Item 303.

131.   On November 5, 2014, AmEx announced the pricing of an offering of 750,000 Depository Shares, each representing a 1/1,000th interest in a 5.200% Fixed Rate/Floating Rate Noncumulative Preferred Share, Series B, $1,000 Liquidation Preference Per Depository Share at $990 per depository share, resulting in total proceeds to AmEx of $742.5 million (the "Depository Share Offering"). On December 2, 2014, AmEx announced the pricing of an offering of $600 million of its 3.625% Subordinated Notes due December 5, 2024 (the "Notes Offering"). In connection with the Depository Offering and the Notes Offering, AmEx filed final Prospectuses with the SEC on November 6, 2014 and December 3, 2014, respectively. The final Prospectuses related to a shelf registration statement that AmEx had filed with the SEC (the "Shelf Registration Statement") and together with the Shelf Registration Statement comprised the "Registration Statement" for each offering. These Registration Statements violated Item 303 for the same reasons that the 2Q'14 10-Q violated Item 303.

132.   By reasons of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

133.   Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AmEx common stock. Lead Plaintiff and the Class would not have purchased AmEx common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' material omissions.

<u>SECOND CAUSE OF ACTION</u>

**For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
with Respect to Materially False and Misleading Statements Quantifying and Disclosing
the Significance of the Delta Agreement but Not the Costco U.S. Agreement
<u>(Against All Defendants)</u>**

134.    Lead Plaintiff incorporates by reference and reallege ¶¶ 1-123 as fully set forth
herein.

135.    This cause of action is brought by Lead Plaintiff under Section 10(b) of the
Exchange Act and SEC Rule 10b-5 against all Defendants.

136.    During the Class Period, these Defendants disseminated or approved the false
statements specified above, which they knew or deliberately disregarded were misleading in that
they contained misrepresentations and failed to disclose material facts necessary in order to make
the statements made, in light of the circumstances under which they were made, not misleading.

137.    The Defendants named in this Cause of Action violated Section 10(b) of the
Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to
defraud; (b) made untrue statements of material facts or omitted to state material facts necessary
in order to make the statements made, in light of the circumstances under which they were made,
not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud
or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of
AmEx common stock during the Class Period.

138.    The following false and misleading statement was incorporated into AmEx'
2Q'14 10-Q, which was signed by Defendant Campbell and the language was approved by
Defendant Chenault:

> We have agreements with business partners in a variety of industries, including
> the airline industry, that represent a significant portion of our business. We are
> exposed to risks associated with these industries, including bankruptcies,
> liquidations, restructurings, consolidations and alliances of our partners, and the

- 48 -

possible obligation to make payments to our partners. We also face substantial and increasingly intense competition for partner relationships, which could result in a loss or renegotiation of these arrangements that could have a material adverse impact on our business and results of operations.

In the ordinary course of our business we enter into different types of contractual arrangements with business partners in a variety of industries. ***For example, we have partnered with Costco and Delta Air Lines to offer co-branded cards for consumers and small businesses***, and through our Membership Rewards program we have partnered with businesses in many industries, including the airline industry, to offer benefits to Card Member participants. Competition for relationships with key business partners is very intense and there can be no assurance we will be able to grow or maintain these partner relationships. We face the risk that we could lose partner relationships, even after we have invested significant resources, time and expense in acquiring and developing the relationships, which could result in Card Member attrition or additional costs to retain Card Members. We also face the risk that existing relationships will be renegotiated with less favorable terms for us as competition for such relationships increases. The loss of business partners or the renegotiation of existing relationships with terms that are significantly worse for us could have a material adverse impact on our business and results of operations . . . .

***The airline industry represents a significant portion of our billed business and in recent years has undergone bankruptcies, restructurings, consolidations and other similar events. The airline industry accounted for approximately 10 percent of our worldwide billed business for the six months ended June 30, 2014*** . . . .

***Our largest airline co-brand loan portfolio, AmEx's Delta SkyMiles Credit Card, accounted for less than 15 percent of worldwide Card Member loans as of June 30, 2014*** . . . .

139.    Moreover, Defendants also made false and misleading statements in AmEx's 2013 10-K, which was also incorporated into the 3Q'14 10-Q. Defendants quantified and disclosed the amount of AmEx's business attributable to the Delta Agreement stating that the "Delta SkyMiles Credit Card co-brand portfolio accounts for ***approximately 5 percent of the Company's worldwide billed business and less than 15 percent of worldwide Cardmember loans***."

- 49 -

140.   These statements were materially false and misleading because, even assuming they were literally true with respect to the amount of AmEx's business that was attributable to the Delta Agreement, they omitted material facts and created a false impression in context. Specifically, because Defendants quantified and disclosed AmEx's exposure to the Delta Agreement but omitted material facts concerning the size of the Costco U.S. Agreement, a reasonable investor, in the exercise of due care, would have received a false impression that the Company's exposure to the former was more significant than its exposure to the latter, when, in fact, the opposite was true. Indeed, by the third quarter of 2014, the Costco U.S. Agreement was nearly the same size as all of AmEx's airline industry co-brand agreements **combined**.

141.   By reasons of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

142.   Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AmEx common stock. Lead Plaintiff and the Class would not have purchased AmEx common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

### THIRD CAUSE OF ACTION

**For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
with Respect to Material Omissions Concerning the Renewal of the Costco U.S. Agreement
and the Magnitude of the Potential Impact on Nonrenewal on AmEx's Financial Condition
(Against All Defendants)**

143.   Lead Plaintiff incorporates by reference and reallege ¶¶ 1-123 as fully set forth herein.

144.   This cause of action is brought by Lead Plaintiff under Section 10(b) of the Exchange Act and SEC Rule 10b-5 against all Defendants.

145.   During the Class Period, these Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

146.   The Defendants named in this Cause of Action violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of AmEx common stock during the Class Period.

147.   Defendants failed to disclose material adverse facts concerning the Costco U.S. Agreement, which, by September 17, 2014, Defendants had a duty to disclose in light of the risk that Defendants would **not** secure the renewal of the Agreement and the magnitude of the potential impact of nonrenewal on AmEx's financial condition. Specifically, in light of Defendants' misleading statements concerning the significance of the Delta Agreement, Defendants' failure to disclose the material adverse facts that the nonrenewal of the Costco Canada Agreement had already spurred Defendants to initiate early negotiations with Costco concerning the renewal of the Costco U.S. Agreement, which caused Costco to solicit competing bids from other parties, and that the nonrenewal of the Agreement would have a material adverse "near-term financial impact" on AmEx, was misleading.

- 51 -

148.    By reasons of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

149.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AmEx common stock. Lead Plaintiff and the Class would not have purchased AmEx common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' material omissions.

## FOURTH CAUSE OF ACTION

**For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder with Respect to Materially False and Misleading Statements Concerning the Renewal of the Costco U.S. Agreement and the Magnitude of the Potential Impact on Nonrenewal on AmEx' Financial Condition**
**(Against All Defendants)**

150.    Lead Plaintiff incorporates by reference and reallege ¶¶ 1-123 as fully set forth herein.

151.    This cause of action is brought by Lead Plaintiff under Section 10(b) of the Exchange Act and SEC Rule 10b-5 against all Defendants.

152.    During the Class Period, these Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

153.    The Defendants named in this Cause of Action violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made,

not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud

or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of

AmEx common stock during the Class Period.

154.    On January 21, 2015, AmEx held a conference call with investors and analysts to

discuss the Company's fourth quarter and full year of 2014 earnings results and operations.

During the conference call, Defendant Campbell made the following misstatements (in bold and

italics):

> **Analyst**: Yes, Jeff, I was wondering you could give us your thoughts on when we
> might hear on the Costco U.S. deal and if you could talk a little bit around that,
> how you balance what appear to be lighter economics on these co-brand deals
> with the potential lumpiness of a loss of deal, how you think through that.

> **Campbell**: Well, I appreciate the question. Costco is a very important and long-
> term partner of ours. Our U.S. relationship goes back to the 1990s. We think
> we've been great partners and have created a lot of value for their members, our
> Card Members and for both companies. ***I would point out to you that I don't
> think we've said anything about any ongoing discussions we're having with
> Costco. Obviously, with very important partners we are always working every
> day to evolve the relationship to make it better and frankly, to make sure it's
> working for both parties. You can presume we're doing that with Costco as
> we're doing it with all of our partners at any time and if and when we have any
> news as we did with Delta, which we chose to renew early, we would certainly
> tell you***.

155.    These statements were materially false and misleading because they

misrepresented that there were no active, ongoing negotiations with the Costco concerning the

Costco U.S. Agreement. Specifically, Defendant Campbell lied to the market when he stated that

there were no negotiations other than the "every day" contacts that AmEx was "doing [] with all

of our partners at any time." And Campbell's statement that "if and when we have news, as we

did with Delta which we chose to renew early, we will certainly tell you" misleadingly signaled

that the Company had not initiated early negotiations with Costco concerning the renewal of the

Costco U.S. Agreement (when, in fact, it had), and that the renewal of the Costco U.S.

Agreement (as had then-recently occurred with respect to the Delta Agreement) was on the horizon. By not disclosing the material adverse facts that the nonrenewal of the Costco Canada Agreement had already spurred Defendants to initiate early negotiations with Costco concerning the renewal of the Costco U.S. Agreement, and that the loss of the Agreement would have a material adverse "near-term financial impact" on AmEx, investors were misled about the actual risk posed to the Company's financial condition by the potential loss of the Agreement.

156.    By reasons of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

157.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AmEx common stock. Lead Plaintiff and the Class would not have purchased AmEx common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## FIFTH CAUSE OF ACTION

**For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder with Respect to Materially False and Misleading Statements Contrasting the Costco Canada Agreement and the Costco U.S. Agreement, Which Defendants Had a Duty to Update**
**(Against All Defendants)**

158.    Lead Plaintiff incorporates by reference and reallege ¶¶ 1-123 as fully set forth herein.

159.    This cause of action is brought by Lead Plaintiff under Section 10(b) of the Exchange Act and SEC Rule 10b-5 against all Defendants.

160.    During the Class Period, these Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that

they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

161.    The Defendants named in this Cause of Action violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of AmEx common stock during the Class Period.

162.    On the morning of September 18, 2014, *Bloomberg* reported on the loss of the Costco Canada Agreement in an article titled *Costco Stores in Canada to Stop Taking American Express*. *Bloomberg* quoted the Vice President of Communications for AmEx Canada, as stating: "The terms of the contract was [*sic*] up, AmEx and Costco entered into negotiations and were unable to come to terms. . . . ***This is very specific and exclusive to Canada. There are separate contracts for AmEx's U.S. Costco Relationship***."

163.    On October 15, 2014, Defendants held a conference call with analysts and investors to discuss the Company's earnings release and operations. During the conference call, Defendant Campbell discussed the loss of the Costco Canada Agreement and made the following false and misleading statement:

> I'll note that ***we have separate agreements with Costco in each of the several markets where we maintain a partnership, and have a longer and more significant relationship with Costco in the US, dating back over 15 years.*** As with any long-term partnership, ***we work with Costco on an ongoing basis to find ways to drive value for both parties going forward,*** never losing sight of the fact that we are serving the same customers.

- 55 -

164.    By underscoring the historical strength of the Costco U.S. Agreement and setting it apart from the failed Costco Canada Agreement, Defendants downplayed the risk of losing the Costco U.S. Agreement. Defendants' downplaying the risk subsequently became materially misleading because it concealed the material adverse facts that, subsequent to making the above misstatements, the nonrenewal of the Costco Canada Agreement spurred Defendants to initiate early negotiations with Costco concerning the renewal of the Costco U.S. Agreement, that Costco solicited competing bids from other parties, and that the outcome of those negotiations would have a material adverse "near-term financial impact" on AmEx.

165.    By reasons of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

166.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for AmEx common stock. Lead Plaintiff and the Class would not have purchased AmEx common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## SIXTH CAUSE OF ACTION

### For Violations of §20(a) of the Exchange Act
### (Against the Individual Defendants)

167.    Lead Plaintiff incorporates by reference and reallege ¶¶ 1-123 as fully set forth herein.

168.    This cause of action is brought by Lead Plaintiff under Section 20(a) of the Exchange Act and SEC Rule 10b-5 against the Individual Defendants.

- 56 -

169.    The Individual Defendants acted as controlling persons of AmEx within the meaning of §20(a) of the Exchange Act. By reason of their positions with the Company, and their ownership of AmEx common stock, the Individual Defendants had the power and authority to cause AmEx to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## XV.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Local 537 as Lead Plaintiff and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding rescission or a rescissory measure of damages; and

E.    Awarding such equitable/injunctive or other relief as deemed appropriate by the Court.

## XVI.   JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: January 19, 2016                    LABATON SUCHAROW LLP
                                           THOMAS A. DUBBS
                                           THOMAS G. HOFFMAN, JR.

                                                  /S/ THOMAS A. DUBBS
                                           _____
                                                  THOMAS A. DUBBS

                                           140 Broadway
                                           New York, NY 10005
                                           Telephone: 212/907-0700
                                           tdubbs@labaton.com
                                           thoffman@labaton.com

                                           ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                           SAMUEL H. RUDMAN
                                           AVITAL O. MALINA

                                           58 South Service Road, Suite 200
                                           Melville, NY 11747
                                           Telephone: 631/367-7100
                                           631/367-1173 (fax)
                                           srudman@rgrdlaw.com
                                           amalina@rgrdlaw.com


                                           *Lead Counsel*

                                           CAVANAGH & O'HARA
                                           PATRICK O'HARA
                                           JOHN T. LONG
                                           407 E. Adams Street
                                           Springfield, IL 62701
                                           Telephone: 217/544-1771