USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _9/30/17_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PLUMBERS AND STEAMFITTERS
LOCAL 137 PENSION FUND, Individually
and on Behalf of All Others Similarly
Situated,

                  Plaintiff,

      - against -

AMERICAN EXPRESS COMPANY,
KENNETH I. CHENAULT and JEFFREY
C. CAMPBELL,

                Defendants.

**MEMORANDUM
OPINION & ORDER**

15 Civ. 5999 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

        This is a putative class action brought on behalf of purchasers of Defendant

American Express's ("Amex") common stock between September 17, 2014 and February 11,

2015 (the "Class Period"). The Amended Complaint asserts claims under Sections 10(b) and

20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 relating to the non-renewal of

Amex's co-brand agreement with Costco in the United States. (Dkt. No. 38) Defendants have

moved to dismiss the Amended Complaint, arguing that Amex's disclosures were sufficient and

not false or misleading, and that Plaintiff has not pled particularized facts supporting a strong

inference that Defendants acted with scienter. (Dkt. No. 44) For the reasons stated below,

Defendants' motion will be granted.

# BACKGROUND[1]

## I.    AMEX'S BUSINESS MODEL

Amex is a public company based in New York City that provides charge and credit payment card products and travel-related services to individuals and businesses around the world. (Am. Cmplt. (Dkt. No. 38) ¶¶ 2, 19)  Defendant Kenneth I. Chenault is, and was throughout the Class Period, the chairman of the Amex board of directors and Amex's chief executive officer. (Id. ¶ 20)  Defendant Jeffrey C. Campbell is, and was throughout the Class Period, a senior vice president and Amex's chief financial officer. (Id. ¶ 21)

Amex's derives most of its revenue from fees it charges merchants each time a cardholder makes a purchase using an Amex card. (Id. ¶ 34)  Amex uses some of this revenue to provide rewards and services to cardholders to encourage them to spend less at merchants who do not accept its cards. (Id. ¶ 36)  Amex markets itself to merchants by citing "'cardholder insistence' and loyalty." (Id.)

Amex's competitors generate most of their revenue from interest and fees charged to cardholders who do not pay off their monthly balances. (Id. ¶ 34)  As a result, Amex's competitors often charge lower fees to merchants. (See id. ¶¶ 34-35)

---

[1] The Court's statement of facts is drawn from the Amended Complaint's factual allegations, which are presumed to be true for purposes of this motion. See Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)).  In deciding a motion to dismiss, a Court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

## II.    AMEX'S CO-BRAND AGREEMENTS

In addition to its own proprietary cards, Amex offers co-branded cards pursuant to agreements with certain retailers and travel providers, including Delta Airlines. (Id. ¶¶ 2, 37) The agreements typically have terms of five to eight years. (Id. ¶ 37) Amex entered into a co-brand agreement with Delta (the "Delta Agreement") in 1996, and that agreement was renewed in December 2008 and January 2015. (Id. ¶ 43)

Costco is an international chain of membership warehouses that sells goods in larger quantities at prices lower than typically found at retail stores. (Id. ¶ 40) Between 1999 and 2016, Amex had an exclusive co-brand agreement with Costco for Costco's United States business (the "Costco U.S. Agreement"). (Id. ¶ 3) Between 2010 and 2014, Amex also had a separate co-brand agreement with Costco's Canadian operations (the "Costco Canada Agreement"). (Id.) The Costco U.S. Agreement expired on March 31, 2016, and the Costco Canada Agreement expired on December 31, 2014. (Id. ¶¶ 3, 42)

## III.    PRE-CLASS PERIOD DISCLOSURE OF
## CO-BRAND BUSINESS AND RISK

Prior to September 17, 2014 – the start of the Class Period – the last time Amex disclosed the amount of its business attributable to the Delta and Costco U.S. Agreements was in 2008. (Id. ¶ 44) In an August 6, 2008 presentation, one of Amex's officers stated that Delta and Costco accounted for 13% and 14% of Amex's receivables, respectively. (Id.) In 2009, after Delta merged with Northwest Airlines, Defendant Chenault stated publicly that "[o]ur largest co-brand partner is the new airline combination of Delta and Northwest." (Id. ¶ 45)

On June 26, 2012, the Securities and Exchange Commission ("SEC") sent a Comment Letter to Chenault concerning Amex's draft Form 10-K for fiscal year 2011. (Id. ¶ 46;

Ascher Decl. (Dkt. No. 46-6), Ex. 6 at 1[2]) In the section entitled "**Risk Factors,**" the draft Form 10-K stated:

> *We have agreements with business partners in a variety of industries, including the airline industry, that represent a significant portion of our billed business. We are exposed to the risk of downturns in these industries, including bankruptcies, restructurings and consolidations of our partners, and the possible obligation to make payments to our partners.*
>
> In the ordinary course of our business we enter into different types of contractual arrangements with business partners in a variety of industries. For example, we have partnered with Costco to offer co-branded cards for consumers and small businesses, and through our Membership Rewards program we have partnered with businesses in many industries, most notably the airline industry, to offer benefits to Cardmember participants. . . . The airline industry represents a significant portion of our billed business and in recent years has undergone bankruptcies, restructurings, consolidations and other similar events. In particular, we are exposed to risk under our agreements with Delta Air Lines, which were restructured in connection with Delta's filing for protection under Chapter 11 of the Bankruptcy Code. . . .

(Am. Cmplt. (Dkt. No. 38) ¶ 46) (emphasis in original)[3]

The SEC requested that "[i]n future filings, beginning with [Amex's] next Form 10-Q, . . . expand this risk factor to address the following":

> Quantify your exposure to the airline industry under the risk scenarios described.
>
> Disclose the portion of your billed business and worldwide cardmember loans that the airline industry and Delta Air Lines account for.

(Ascher Decl. (Dkt. No. 46-6), Ex. 6 at 3) The SEC did not mention Costco.

---

[2] The page numbers of documents referenced in this Order correspond to the page numbers designated by this District's Electronic Case Filing system.

[3] While the Amended Complaint alleges that this text appeared in a draft Form 10-K for 2011, the text recited in Amex's response letter to the SEC does not contain the last sentence regarding Delta's Chapter 11 filing. (See Ascher Decl. (Dkt. No. 46-6), Ex. 6 at 5) Rather, that information last appeared in Amex's 2006 Form 10-K. See American Express Co., Annual Report (Form 10-K) (Mar. 1, 2007) at 44 (available at https://www.sec.gov/Archives/edgar/data/4962/000095012307003020/y30921e10vk.htm).

In response to the SEC's Comment Letter, Amex's 2012 Form 10-K disclosed that "American Express' Delta SkyMiles Credit Card cobrand portfolio accounts for approximately 5 percent of the Company's worldwide billed business and less than 15 percent of worldwide cardmember loans." (Id. (Dkt. No. 46-7), Ex. 7 at 24; Am. Cmplt. (Dkt. No. 38) ¶ 48) The 2012 Form 10-K also notes that Amex's "largest airline cobrand loan portfolio[] [is] American Express' Delta SkyMiles Credit Card." (Ascher Decl. (Dkt. No. 46-7), Ex. 7 at 19)

## IV.    EVENTS DURING THE CLASS PERIOD

"On September 17, 2014, Costco announced that it would not be renewing the Costco Canada Agreement," which was due to expire on December 31, 2014. (Am. Cmplt. (Dkt No. 38) ¶¶ 3-4, 56) Costco replaced Amex with MasterCard. (Id. ¶ 8)

Amex subsequently decided to initiate early negotiations with Costco concerning the renewal of the Costco U.S. Agreement, even though that agreement did not expire until March 31, 2016. (Id. ¶ 57) "[A]s a result of AmEx's approach, Costco decided to open the process to other potential partners." (Id. ¶¶ 5, 58)

In January 2015, during Amex's negotiations with Costco, Defendant Chenault called Costco CEO Craig Jelinek "to remind him that AmEx had not just furnished Costco with access to its prestigious brand, [but that] the Company also had been Costco's 'trusted partner.'" (Id. ¶¶ 7, 59) Jelinek interrupted Chenault to say that, as far as he was concerned, Amex was a "vendor," just like those that sold "ketchup" at Costco, and that if Jelinek could "'get cheaper ketchup somewhere else, [he] w[ould].'" (Id. ¶¶ 6, 59)

According to a confidential witness who worked for Amex for eighteen years – including on the Costco co-brand account until October 2014 – Costco did not see Amex as a "partner." (Id. ¶¶ 60-61; id. at 20 n.3) Costco employees routinely referred to Amex as "'just another vendor.'" (Id. ¶¶ 60-61)

At some point prior to January 12, 2015, Amex announced that it had renewed the Delta Agreement ahead of schedule. (Id. ¶ 86)

## V. STATEMENTS DURING THE CLASS PERIOD

### A. The Bloomberg Article Concerning the Non-Renewal of the Costco Canada Agreement

On September 18, 2014, Bloomberg reported that the Costco Canada Agreement would not be renewed. (Id. ¶ 90) Bloomberg's article includes the following statement:

> "The term of the contract was up, AmEx and Costco entered into negotiations and were unable to come to terms," David Barnes, a spokesman for AmEx in Canada, said in a phone interview. "This is very specific and exclusive to Canada. There are separate contracts for AmEx's U.S. Costco relationship."

(Ascher Decl. (Dkt. No. 46-12), Ex. 12 at 1)

### B. The October 15, 2014 Earnings Call

In a press release on October 15, 2014, Amex announced its financial results for the third quarter of 2014, which ended on September 30, 2014. (Id. ¶ 91) After the earnings announcement, Amex held a conference call with analysts and investors. (Id. ¶ 92) During that call, and in connection with the non-renewal of the Costco Canada Agreement, Defendant Campbell said:

> I'll note that we have separate agreements with Costco in each of the several markets where we maintain a partnership, and have a longer and more significant relationship with Costco in the US, dating back over 15 years. As with any long-term partnership, we work with Costco on an ongoing basis to find ways to drive value for both parties going forward, never losing sight of the fact that we are serving the same customers.

(Am. Cmplt. (Dkt. No. 38) ¶¶ 92, 163 (emphasis omitted))

## C. **Amex's Third Quarter 2014 Form 10-Q**

On October 28, 2014, Amex filed its Form 10-Q for the third quarter of 2014. The Third Quarter 2014 10-Q incorporated by reference the "Risk Factors" sections from Amex's 2013 Form 10-K and its Form 10-Q for the second quarter of 2014. (Id. at 26 n.4)

### 1. **Amex's 2013 Form 10-K**

Amex's 2013 Form 10-K includes in the "Risk Factors" section the following statement:

EXPOSURE TO THE AIRLINE INDUSTRY

The Company has multiple important co-brand, rewards and corporate payment arrangements with airlines. The Company's largest airline partner is Delta and this relationship includes exclusive co-brand credit card partnerships and other arrangements including Membership Rewards, merchant acceptance, travel and corporate payments programs. American Express' Delta SkyMiles Credit Card co-brand portfolio accounts for approximately 5 percent of the Company's worldwide billed business and less than 15 percent of worldwide Card Member loans. Refer to Notes 4 and 8 for further information on receivables and other assets recorded by the Company relating to these relationships.

In recent years, the airline industry has undergone bankruptcies, restructurings, consolidations and other similar events. Historically, the Company has not experienced significant revenue declines when a particular airline scales back or ceases operations due to a bankruptcy or other financial challenges because volumes generated by that airline are typically shifted to other participants in the industry that accept the Company's card products. The Company's exposure to business and credit risk in the airline industry is primarily through business arrangements where the Company has remitted payment to the airline for a Card Member purchase of tickets that have not yet been used or "flown". The Company mitigates this risk by delaying payment to the airlines with deteriorating financial situations, thereby increasing cash withheld to protect the Company in the event the airline is liquidated. To date, the Company has not experienced significant losses from airlines that have ceased operations.

(Ascher Decl. (Dkt. No. 46-8), Ex. 8 (2013 10-K) at 27 (emphasis in original))

### 2. **Amex's Second Quarter 2014 Form 10-Q**

Amex's Form 10-Q for the second quarter of 2014 includes the following statement under the heading "Risk Factors":

*We have agreements with business partners in a variety of industries, including the airline industry, that represent a significant portion of our business. We are exposed to risks associated with these industries, including bankruptcies, liquidations, restructurings, consolidations and alliances of our partners, and the possible obligation to make payments to our partners. We also face substantial and increasingly intense competition for partner relationships, which could result in a loss or renegotiation of these arrangements that could have a material adverse impact on our business and results of operations.*

In the ordinary course of our business we enter into different types of contractual arrangements with business partners in a variety of industries. For example, we have partnered with Costco and Delta Air Lines to offer cobranded cards for consumers and small businesses, and through our Membership Rewards program we have partnered with businesses in many industries, including the airline industry, to offer benefits to Card Member participants. Competition for relationships with key business partners is very intense and there can be no assurance we will be able to grow or maintain these partner relationships. We face the risk that we could lose partner relationships, even after we have invested significant resources, time and expense in acquiring and developing the relationships, which could result in Card Member attrition or additional costs to retain Card Members. We also face the risk that existing relationships will be renegotiated with less favorable terms for us as competition for such relationships increases. The loss of business partners or the renegotiation of existing relationships with terms that are significantly worse for us could have a material adverse impact on our business and results of operations.

We may be obligated to make or accelerate payments to certain business partners such as cobrand partners and merchants upon the occurrence of certain triggering events such as: (i) our filing for bankruptcy, (ii) our economic condition deteriorating such that our senior unsecured debt rating is downgraded significantly below investment grade by S&P and Moody's, (iii) our ceasing to have a public debt rating, or (iv) a shortfall in certain performance levels. If we are not able to effectively manage the triggering events, we could unexpectedly have to make payments to these partners, which could have a negative effect on our financial condition and results of operations. Similarly, we have credit risk to certain cobrand partners relating to our prepayments for loyalty program points that may not be fully redeemed. We are also exposed to risk from bankruptcies, liquidations, insolvencies, financial distress, restructurings, consolidations and other similar events that may occur in any industry representing a significant portion of our billed business, which could negatively impact particular Card products and services (and billed business generally) and our financial condition and results of operations. For example, we could be materially impacted if we were obligated to or elected to reimburse Card Members for products and services purchased from merchants that have ceased operations or stopped accepting our Cards.

The airline industry represents a significant portion of our billed business and in recent years has undergone bankruptcies, restructurings, consolidations and other similar events. The airline industry accounted for approximately 10 percent of our worldwide billed business for the six months ended June 30, 2014.

There continues to be significant consolidation in the airline industry, particularly in the United States (e.g., American/US Airways), through mergers and/or grants of antitrust immunity to airline alliances and joint ventures, and this trend could continue. In particular, the United States Department of Transportation has granted antitrust immunity to members of the Skyteam, Star and Oneworld Alliances, enabling the covered airlines to closely coordinate their crossregional operations and to launch highly integrated joint ventures in transatlantic and other markets, including jointly pricing and managing capacity on covered routes, sharing revenues and costs, and coordinating sales and corporate contracts, all outside the scope of the U.S. antitrust laws. The EC has similarly approved the Star and Oneworld Alliances, and its review of the Skyteam Alliance and cooperation between its members is continuing. Increasing consolidation and expanded antitrust immunity could create challenges for our relationships with the airlines, including reducing our profitability on our airline business.

Airlines are also some of the most important and valuable partners in our Membership Rewards program. If a participating airline merged with an airline that did not participate in Membership Rewards, the combined airline would have to determine whether or not to continue participation. Similarly, if one of our cobrand airline partners merged with an airline that had a competing cobrand card, the combined airline would have to determine which cobrand cards it would offer. Our largest airline cobrand loan portfolio, American Express' Delta SkyMiles Credit Card, accounted for less than 15 percent of worldwide Card Member loans as of June 30, 2014.

If an airline determined to withdraw from Membership Rewards, change the terms under which it participates in the program or to cease offering an American Express cobrand Card, whether as the result of a merger or otherwise, such as the withdrawal of Continental Airlines in 2011 from our Airport Club Access program for Centurion and Platinum Card Members and our Membership Rewards points transfer program or the withdrawal of American Airlines in 2014 from our Airport Club Access program for Centurion and Platinum Card Members, our business could be adversely affected. For additional information relating to the general risks related to the airline industry, see "Risk Management — Exposure to the Airline Industry" on page 44 of our 2013 Annual Report to Shareholders.

(Ascher Decl. (Dkt. No. 46-10), Ex. 10 (Second Quarter 2014 10-Q) at 9-10 (bold and italics emphasis in original; underline emphasis added))

**D.**   **January 12, 2015 Earnings Call**

On January 12, 2015, Amex held a call with investors and analysts to discuss the

company's financial results for the fourth quarter of 2014. (Am. Cmplt. (Dkt. No. 38) ¶ 54)

During the call, Defendant Campbell responded to questions about the Costco U.S. Agreement

and the Delta Agreement:

**1.**   **Comments Concerning the Costco U.S. Agreement**

A Citigroup analyst asked Campbell to discuss the Costco U.S. Agreement and

"when we might hear" whether it would be renewed:

> OPERATOR: Thank you. And next we have Don Fandetti with Citigroup.
> Please go ahead.
>
> DON FANDETTI, ANALYST, CITIGROUP: Yes, Jeff, I was wondering if you
> could give us your thoughts on when we might hear on the Costco US deal and if
> you could talk a little bit around that, how you balance what appear to be lighter
> economics on these co-brand deals with the potential lumpiness of a loss of a
> deal, how you think through that.
>
> JEFF CAMPBELL: Well, I appreciate the question. Costco is a very important
> and long-term partner of ours. Our US relationship goes back to the 1990s. We
> think we've been great partners and have created a lot of value for their members,
> our card members and for both companies. I would point out to you that I don't
> think we've said anything about any ongoing discussions we're having with
> Costco. Obviously, with very important partners we are always working every
> day to evolve the relationship to make it better and frankly, to make sure it's
> working for both parties.
>
> You can presume we're doing that with Costco as we're doing it with all of our
> partners at any time and if and when we have any news as we did with Delta,
> which we chose to renew early, we would certainly tell you. In terms of thinking
> about the economics of these things, you've certainly heard a number of us, both
> Ken and I and some of our colleagues talk about the competitive environment for
> co-brands in recent months and quarters and that's true. I think you have to
> balance those comments with the fact that these are still one of many good
> economic growth opportunities we have as a Company.
>
> And while yes, the environment has become competitive and certainly there are
> cases where we conclude, because we're pretty selective, that we think we're
> better off not either getting into or proceeding with certain kinds of co-brand
> partnerships because we have so many other opportunities in our proprietary

business, as a general matter these still are attractive and important parts of our overall business model. And when we have great partners where our interests are really aligned, and I'll go back to the recent renewals with Delta and Starwood, we think we can create great value together and for all parties involved.

(Ascher Decl. (Dkt. No. 46-24), Ex. 24 (Jan. 12, 2015 Earnings Call) at 10-11)

## 2. Comments Concerning the Delta Agreement

Later in the call, a Credit Suisse analyst questioned Campbell about the Delta

Agreement. During the ensuing discussion, the analyst and Campbell referenced the disclosure

in Amex's 2013 10-K that the Delta co-brand relationship accounted for about 5% of Amex's

worldwide billed business:

> OPERATOR: Thank you. We'll go next to Moshe Orenbuch with Credit Suisse. Go ahead, please.

> MOSHE ORENBUCH, ANALYST, CREDIT SUISSE: Back on the Delta, you've said that it's -- Delta said that they were going to double the benefits from that relationship with American Express to them as part of the new contract. Is there any way you could size what percentage of your rewards costs relate to that, both across the co-brand and the purchase of MR points?

> JEFF CAMPBELL: I must admit, Moshe, I missed their double comment but maybe --

> MOSHE ORENBUCH: They did an Investor Day a couple of weeks back at which they said that.

> JEFF CAMPBELL: But look, they're a great partner for us and as I explained earlier, we have a really broad relationship with Delta that cuts across so many parts of both of our companies. It's generated tremendous value for us and it's generated tremendous value for them. We last renewed it in 2008 and it's now locked in for quite some period of time and we're really pleased with that and we're both very focused on growing the very mutual interest we have in a common card member and flier base.

> All that said, they're a good partner and I think we've been pretty clear that in general there's a reset often when you do these kinds of renewals after a long time and I said on my earlier remarks, Delta is no exception. You do see the one piece of the economics in the charges we took in Q4. And that is that there is an impact that caused us to re-price the bank of MR points, so that basically tells you we're going to pay Delta a little bit more money when a membership rewards member transfers MR points to redeem a flight on Delta.

That's actually very similar to something we did back in 2008, in fact the charge is almost the same size as something that we took back in 2008. So that's not new. I think it's just sort of a standard part of the reset. Beyond that, I don't want to try to size the overall economics of a specific agreement as we have with Delta and there's many, many ways that they may think about the value so I actually couldn't tell you how they might have gotten to the --

MOSHE ORENBUCH: Is it fair then just to add to that the fact that you've got 5% of your spending volume in the co-brand? Because that's not part of the MR program, right? That's a disclosure you made in the 10-K, about 5% of your spend is the Delta co-brand.

JEFF CAMPBELL: Yes, you're correct. And of course we spell that out in the 10-K because it rises to a level that, from an SEC perspective, we should disclose.

(Id. at 15-16; see also Am. Cmplt. (Dkt. No. 38) ¶¶ 54-55)

E.    The February 12, 2015 Disclosure that the
      Costco U.S. Agreement Would Not Be Renewed

On February 12, 2015, Amex announced that it had not be able to reach an

agreement with Costco concerning the renewal of the Costco U.S. Agreement. (Am. Cmplt.

(Dkt. No. 38) ¶ 11) Amex also disclosed that

the [Costco U.S.] Agreement generated 8% of AmEx's worldwide billed business (and [that] another 1% of worldwide billings was generated by other AmEx cardholders' spending at Costco), that one in ten AmEx cards worldwide had been issued pursuant to the Costco U.S. Agreement, and that 20% of the Company's outstanding loans had been made pursuant to that Agreement.

(Id. ¶ 11 (emphasis omitted))

On a call later that day with investors and analysts, Chenault said:

In evaluating our co-brand relationships in this broader context, we decided to accelerate contract renewal discussions with several co-brand partners well in advance of their expiration dates. Our goal has been to reach multi-year renewals of those partnerships that could offer the best value for our card members, the best potential for growth and the best economics for our shareholders. We took this step knowing that it could have a near-term financial impact but also knowing that it would provide clarity about the lineup of partners and programs we would focus on going forward.

(Ascher Decl. (Dkt. No. 46-4), Ex. 4 (Feb. 12, 2015 Call) at 4 (emphasis added); see also Am. Cmplt. (Dkt. No. 38) ¶¶ 76(b), 83(b), 88(a), 94(b), 99)  Chenault went on to note that "[t]he move to accelerate discussions led us to renew several co-brand relationships that were very key for us in 2014, including our longstanding partnerships with Delta, Starwood, and Cathay Pacific.  We were delighted to extend each of these strong relationships for multiple years."  (Ascher Decl. (Dkt. No. 46-4), Ex. 4 (Feb. 12, 2015 Call) at 5)

"In response to these announcements, the price of AmEx common stock dropped from $86.01 per share on February 11, 2015, to its close at $78.08 per share on February 13, 2015 . . . ."  (Am. Cmplt. (Dkt. No. 38) ¶ 12)

In Amex's 2014 Form 10-K, filed on February 24, 2015, Amex disclosed that its "cobrand portfolio accounted for less than 25 percent of [its] worldwide billed business for the year ended December 31, 2014 and less than 50 percent of [its] worldwide Card Member loans as of December 31, 2014."  (Ascher Decl. (Dkt. No. 46-1), Ex. 1 at 48; Am. Cmplt. (Dkt. No. 38) ¶ 115)  The Delta Agreement accounted for 6% of billed business and 15% of worldwide cardholder loans.  (Am. Cmplt. (Dkt. No. 38) ¶ 49)

## VI.   **THE INSTANT ACTION**

The Complaint was filed on July 30, 2015.  (Dkt. No. 1)  On November 17, 2015, this Court appointed Plaintiff as lead plaintiff.  (Dkt. No. 28)  The Amended Complaint was filed on January 19, 2016.  (Dkt. No. 38)

The Amended Complaint pleads that the Defendants violated Section 10(b) and Rule 10b-5 (1) by not disclosing "known trends and uncertainties concerning the renewal of the Costco U.S. Agreement" (First Cause of Action); (2) by "quantifying and disclosing the significance of the Delta Agreement but not the Costco U.S. Agreement" (Second Cause of Action); (3) through "material omissions concerning the renewal of the Costco U.S. Agreement

and the magnitude of the potential impact [of] nonrenewal on AmEx's financial condition"

(Third Cause of Action); (4) by making "materially false and misleading statements concerning

the renewal of the Costco U.S. Agreement and the magnitude of the potential impact [of]

nonrenewal on AmEx['s] financial condition" (Fourth Cause of Action); and (5) by making

"materially false and misleading statements contrasting the Costco Canada Agreement and the

Costco U.S. Agreement, which Defendants had a duty to update" (Fifth Cause of Action).   (Am.

Cmplt. (Dkt. No. 38) at 49-60)  The Amended Complaint also contains a Section 20(a) claim

against the individual Defendants. (Id. at 60-61)

Defendants have moved to dismiss. (Dkt. No. 44)

## STANDARD OF REVIEW

## I.   MOTION TO DISMISS

"To survive a motion to dismiss, a complaint must contain sufficient factual

matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v.

Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the

complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing

Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)),

and must "draw all reasonable inferences in favor of the plaintiff," id. (citing Fernandez v.

Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of

'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and

does not provide factual allegations sufficient "to give the defendant fair notice of what the claim

is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507

F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555).

As noted above, "[i]n considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010) (citing Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002); Hayden v. Cnty. of Nassau, 180 F.3d 42, 54 (2d Cir. 1999)). Moreover, "[w]here a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." Id. (quoting Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006)). A court may also consider "legally required public disclosure documents filed with the SEC." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

## II.   **STATUTORY FRAMEWORK**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance" in violation of the rules set forth by the SEC for the protection of investors. 15 U.S.C. § 78j. Pursuant to SEC Rule 10b-5, promulgated thereunder, it is unlawful:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To sustain a private cause of action for securities fraud under Section 10(b) and

Rule 10b-5

> a plaintiff must prove (1) a material misrepresentation or omission by the
> defendant; (2) scienter; (3) a connection between the misrepresentation or
> omission and the purchase or sale of a security; (4) reliance upon the
> misrepresentation or omission; (5) economic loss; and (6) loss causation.

Stoneridge Inv. Partners, LLC v. Scientific–Atlanta, Inc., 552 U.S. 148, 157 (2008) (citing Dura

Pharm., Inc. v. Broudo, 544 U.S. 336, 341-42 (2005)).

## III.    SECURITIES FRAUD COMPLAINTS

"A complaint alleging securities fraud pursuant to Section 10(b) of the Securities

Exchange Act is subject to two heightened pleading standards." In re Gen. Elec. Co. Sec. Litig.,

857 F. Supp. 2d 367, 383 (S.D.N.Y. 2010). First, the complaint must satisfy Federal Rule of

Civil Procedure 9(b), which requires that "a party . . . state with particularity the circumstances

constituting fraud." Fed. R. Civ. P. 9(b). "Second, the complaint must meet the pleading

requirements of the Private Securities Litigation Reform Act ('PSLRA'), 15 U.S.C. § 78u-4(b)."

In re Gen. Elec., 857 F. Supp. 2d at 383.

The heightened pleading requirement under Rule 9(b) "serves to provide a

defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident

charges of wrongdoing, and protect him against strike suits." ATSI Commc'ns, 493 F.3d at 99.

Accordingly, a securities fraud complaint based on misstatements or material omissions must

"'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker,

(3) state where and when the statements were made, and (4) explain why the statements were

fraudulent.'" Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills v. Polar

Molecular Corp., 12 F.3d 1170, 1175 (2d Cir. 1993)).

Moreover, under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) ("The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976))). "To qualify as 'strong' within the intendment of [the PLSRA], . . . an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; see also id. ("[T]o determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PLSRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged."). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

## DISCUSSION

## I.   ALLEGED AFFIRMATIVE MISREPRESENTATIONS AND MATERIAL OMISSIONS

### A.   Whether Amex's Non-Disclosure of Early Negotiations with Costco Was Misleading

In the Amended Complaint's First and Fourth Causes of Action, Plaintiff alleges that Defendants made false or misleading statements regarding Amex's decision to initiate early negotiations with Costco regarding the renewal of the Costco U.S. Agreement. (See Am. Cmplt. (Dkt. No. 38) ¶¶ 86, 154; Pltf. Opp. (Dkt. No. 47) at 18-19) Plaintiff cites Defendant Campbell's

remarks on the January 21, 2015 earnings call, when an analyst asked "when we might hear on the Costco US deal":

> JEFF CAMPBELL: . . . I would point out to you that I don't think we've said anything about any ongoing discussions we're having with Costco. Obviously, with very important partners we are always working every day to evolve the relationship to make it better . . . .
>
> You can presume we're doing that with Costco as we're doing it with all of our partners at any time . . . .

(Am. Cmplt. (Dkt. No. 38) ¶ 154 (emphasis omitted); see also id. ¶¶ 84-87; Pltf. Opp. (Dkt. No. 47) at 18; Ascher Decl. (Dkt. No. 46-24), Ex. 24 (Jan. 12, 2015 Earnings Call) at 10-11)

Plaintiff argues that "[t]hese statements were materially false and misleading because they misrepresented that there were no active, ongoing negotiations with Costco concerning the Costco U.S. Agreement . . . other than the 'every day' contacts."[4] (Am. Cmplt. (Dkt. No. 38) ¶ 155; see also Pltf. Opp. (Dkt. No. 47) at 18-19 (asserting that Campbell's statements were representations that "AmEx was making no special efforts with respect to the Costco U.S. Agreement, other than the ordinary, day-to-day efforts," and that these representations were misleading because Amex had already begun "competing aggressively to renew the relationship."))[5] Defendants contend, however, that Campbell specifically stated that he was not going to address Amex's negotiations with Costco. (Def. Reply (Dkt. No. 48) at 8)

---

[4] In the Amended Complaint, Plaintiff also contends that Campbell's statement – "You can presume we're doing that with Costco as we're doing it with all of our partners at any time and if and when we have any news as we did with Delta, which we chose to renew early, we would certainly tell you" – was misleading because it somehow signaled both that early negotiations had not begun but that renewal was nonetheless on the horizon. (Am. Cmplt. (Dkt. No. 38) ¶ 154-155) Plaintiff does not press this argument in opposing the motion to dismiss. (See Pltf. Opp. (Dkt. No. 47) at 18-20; Def. Reply (Dkt. No. 48) at 7)

[5] Although Defendants complain that Plaintiff raises this argument for the first time in its opposition, (Def. Reply (Dkt. No. 48) at 7), as is evident from the allegations quoted above, the Amended Complaint contains this theory of liability.

"A statement is misleading if a reasonable investor, in the exercise of due care, would have received a false impression from the statement." In re Par Pharm., Inc. Sec. Litig., 733 F. Supp. 668, 677 (S.D.N.Y. 1990).

Here, Campbell did not say that Amex and Costco were not negotiating, nor did he characterize any discussions the two companies might have been having. Instead, Campbell said that investors "could presume" that Amex was speaking with its co-brand partners, including Costco. His statements indicate that he would not comment on any negotiations with Costco: "I don't think we've said anything about any ongoing discussions we're having with Costco." (Am. Cmplt. (Dkt. No. 38) ¶ 154 (emphasis omitted)) Campbell's statements were not incomplete in characterizing the ongoing negotiations with Costco; Campbell refused to address this subject at all. Campbell's reference to the early renewal of the Delta Agreement – which was announced when the Company had "news" that the co-branding relationship would be renewed – confirmed that Amex would not comment on renewal negotiations with Costco – if there were any – while such negotiations were underway.

Moreover, no reasonable investor would have construed Campbell's remark that Amex was "always working everyday" with its co-branding partners to somehow mean that Amex was only working with its partners on routine matters. As the Supreme Court has noted, "[e]ven with respect to information that a reasonable investor might consider material, companies can control what they have to disclose under these provisions by controlling what they say to the market." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 45 (2011).

Campbell's statements on the January 12, 2015 analyst call regarding negotiations with Costco were not false, misleading, or incomplete.

**B.      Whether Defendants' Disclosures Regarding
          the Delta Agreement Omitted Material Facts**

In the Amended Complaint's Second Cause of Action, Plaintiff alleges that two of

Amex's disclosures concerning its co-brand agreement with Delta were misleading, because they

omitted material facts.

Plaintiff first cites the following statements from Amex's Second Quarter 2014

10-Q, which are incorporated by reference in Amex's Third Quarter 2014 10-Q:

> [f]or example, we have partnered with Costco and Delta Air Lines to offer co-
> branded cards for consumers and small businesses . . . . The airline industry
> represents a significant portion of our billed business and in recent years has
> undergone bankruptcies, restructurings, consolidations and other similar events.
> The airline industry accounted for approximately 10 percent of our worldwide
> billed business for the six months ended June 30, 2014 . . . . Our largest airline
> co-brand loan portfolio, AmEx's Delta SkyMiles Credit Card, accounted for less
> than 15 percent of worldwide Card Member loans as of June 30, 2014 . . . .

(Am. Cmplt. (Dkt. No. 38) ¶ 138)  The Amended Complaint also cites the following statements

in Amex's 2013 10-K, which are likewise incorporated by reference in Amex's Third Quarter

2014 10-Q:  "Delta SkyMiles Credit Card co-brand portfolio accounts for approximately 5

percent of the Company's worldwide billed business and less than 15 percent of worldwide

Cardmember loans."  (Id. ¶ 139 (emphasis omitted))

Plaintiff contends that these statements were materially misleading because – by

omitting information about the significance of the Costco U.S. Agreement – Amex "created the

false impression that the Delta Agreement was more significant to AmEx than the Costco U.S.

Agreement."  (Pltf. Opp. (Dkt. No. 47) at 36; see also id. at 49 ("[S]elective disclosure [of the

Delta data] led the market to believe that the Company's other major co-brand agreement, the

Costco U.S. Agreement, did *not* reach [the 5%] threshold, when in fact that Agreement far

exceeded it." (emphasis in original)))  In support of this argument, Plaintiff points to securities

analysts' inaccurate prognostications concerning the financial impact on Amex of a non-renewal

of the Costco U.S. Agreement.[6] (Id. at 38-41)  Defendants contend, however, that the statements

cited above were not misleading, because they were the product of guidance from the SEC and

were clearly confined to the airline industry.  (Def. Reply (Dkt. No. 48) at 12-14)

"A statement is misleading if a reasonable investor, in the exercise of due care,

would have received a false impression from the statement." In re Par Pharm., 733 F. Supp. at

677.  Under

> that portion of Rule 10b-5 requiring disclosure of additional facts "necessary in
> order to make the statements made, in the light of the circumstances under which
> they were made, not misleading . . . ," even though no duty to make a statement
> on a particular matter has arisen, once corporate officers undertake to make
> statements, they are obligated to speak truthfully and to make such additional
> disclosures as are necessary to avoid rendering the statements made misleading.

Id. at 675; see also Meyer v. Jinkosolar Holdings Co., Ltd., 761 F.3d 245, 250 (2d Cir. 2014)

("[E]ven when there is no existing independent duty to disclose information, once a company

speaks on an issue or topic, there is a duty to tell the whole truth." (citing Caiola v. Citibank,

N.A., 295 F.3d 312, 331 (2d Cir. 2002)).

"[T]hat duty is not boundless," however.  Christine Asia Co. v. Alibaba Grp.

Holding Ltd., 192 F. Supp. 3d 456, 471 (S.D.N.Y. 2016).  "[R]evealing one fact about a subject

does not trigger a duty to reveal all facts on the subject." Richman v. Goldman Sachs Group,

Inc., 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012).  "'[T]he proper inquiry requires an examination

of defendants' representations, taken together and in context.'" Meyer, 761 F.3d at 250-51

(quoting In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 366 (2d Cir. 2010)).  "In

---

[6]  Plaintiff also argues that Amex had a duty to provide data concerning the significance of the
Costco U.S. Agreement, because the Costco-Amex relationship presented as much uncertainty as
Amex's business dealings with the airlines.  (Pltf. Opp. Dkt. No. 47) at 40-41)  But whether
Amex had a duty to disclose the Costco U.S. data is a separate question from whether the
disclosure of other risks was misleading, and Plaintiff does not contend that the disclosure of the
Delta data somehow implied that the renewal of the Costco U.S. Agreement was more certain.

other words, [courts] look to the "total mix" of available information." Christine Asia Co., 192 F. Supp. 3d at 471.

As an initial matter, in arguing that Amex's disclosures were misleading, Plaintiff ignores the language Amex used. The Delta Agreement is described as the "largest airline co-brand portfolio." (Am. Cmplt. (Dkt. No. 38) ¶ 138 (emphasis added)) Amex was thus comparing the Delta co-brand relationship to Amex's co-brand relationships with other airlines. This language cannot reasonably be read as addressing how the Delta relationship compares to non-airline co-brand relationships.

Plaintiff complains, however, that in 2009 Amex said that the Delta Agreement was Amex's largest co-brand relationship. (Pltf. Opp. (Dkt. No. 47) at 40 n.14) But statements made in 2009 do not – under the circumstances here – render statements made in 2014 false and misleading.

Plaintiff also ignores the circumstances under which Amex disclosed data concerning its co-brand relationship with Delta. Amex disclosed the Delta data after receiving a Comment Letter from the SEC in 2012, in which the Commission requested that Amex "[d]isclose the portion of [Amex's] billed business and worldwide cardmember loans that the airline industry and Delta Air Lines account for." (Ascher Decl. (Dkt. No. 46-6), Ex. 6 at 3) The SEC's letter is publicly available, as is Amex's response, in which the Company states that it will include such information in future public filings. See Letter from Suzanne Hayes, Asst. Dir., Sec. & Exch. Comm'n, to Kenneth I. Chenault, Chairman, Chief Exec. Officer, & Dir., Am. Express (June 26, 2012), available at https://www.sec.gov/Archives/edgar/data/4962/000000000012033402/filename1.pdf; (Ascher Decl. (Dkt. No. 46-6), Ex. 6).

As to the context in which the challenged statements were made, these statements are part of a much larger discussion – in the Risk Factors section of the 10-Q – of the risks associated with transacting business with airlines. After a brief mention of Costco and Delta as two of Amex's co-brand partners, the focus shifts to an analysis of developments and tumult in the airline industry. Four paragraphs are devoted to summarizing the risks Amex faces as a result of its business dealings in this space, including the consequences of increasing consolidation and the absence of antitrust enforcement. (See Ascher Decl. (Dkt. No. 46-10), Ex. 10 (Second Quarter 2014 10-Q) at 9-10) It is at the end of this lengthy discussion of the airline industry that data concerning the Delta relationship is disclosed. (See id.) The import of these disclosures is that they are being made because of special risks that Amex faces as a result of its significant business dealings with airlines. Fairly read, these disclosures cannot be read to suggest that Amex's dealings with Delta are more significant than its business dealings with Costco.

The statements from Amex's 2013 10-K cited by Plaintiff – statements that the Third Quarter 2014 10-Q incorporates by reference – are similarly focused on risks associated with doing business with airlines. The heading for the relevant section is "EXPOSURE TO THE AIRLINE INDUSTRY." This section discusses Amex's relationships with airlines – and its "largest airline partner," Delta, in particular – before reviewing the risks that doing business with airlines can pose. (Ascher Decl. (Dkt. No. 46-8), Ex. 8 (2013 10-K) at 27 (emphasis in original)) This section does not reference Costco, nor does it discuss the Delta relationship in the context of increased competition for co-brand agreements.

Plaintiff's allegations and arguments concerning the poor predictions made by a number of analysts miss the mark for several reasons. As an initial matter, the Amended

Complaint does not reveal how the analysts it cites were selected, how large a group they were selected from, or whether these analysts' poor predictions are representative of broader financial analysis at the relevant time. (See Am. Cmplt. (Dkt. No. 38) ¶¶ 104-105) Absent such information, it is impossible to determine whether the analysts who are cited are the few who were wrong, or whether their mistaken estimates are indicative of a broader market understanding. Moreover, the mere fact that certain analysts were wrong about how significant the Costco U.S. relationship was to Amex's financial performance does not demonstrate that Amex's statements were responsible for the analysts' poor estimates. Indeed, the Amended Complaint cites two analysts who admitted relying on information Amex provided in 2008. (Id. ¶ 52)

In sum, "[t]here is no duty to disclose a fact . . . 'merely because a reasonable investor [or analyst] would very much like to know that fact. . . ,'" Meyer, 761 F.3d at 250 (quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir. 1993)), and even though analysts might have made better predictions with different information, that circumstance alone does not impose on Defendants a duty to update or disclose. Finally, that a few analysts might have ignored the context in which Amex's statements were made – and relied on data from five years earlier – in attempting to estimate the financial significance of the Costco U.S. relationship to Amex, does not make Amex's statements misleading where the language and import of Amex's statements are plain.[7]

---

[7] The cases Plaintiff cites in support of its argument that analyst reactions are sufficient to plausibly show the misleading nature of statements, (see Pltf. Opp. (Dkt. No. 47) at 39-40), are not on point. In In re STEC Inc. Sec. Litig., No. CV09-08536-JVS MLGX, 2011 WL 2669217, at *8 (C.D. Cal. June 17, 2011), for example, the court found that plaintiffs had plausibly alleged that defendants' statements were misleading where they suggested that a one-time contract was of a recurring nature. Although the court noted that "[p]articular statements made by analysts

### C. Whether Defendants Had a Duty to Update Their Statements Regarding the Non-Renewal of the Costco Canada Agreement

In the Amended Complaint's Fifth Cause of Action, Plaintiff alleges that two statements Defendants made regarding the non-renewal of the Costco Canada Agreement were materially misleading because they "concealed . . . material adverse facts" concerning Amex's negotiations with Costco regarding the Costco U.S. Agreement. (Am. Cmplt. (Dkt. No. 38) ¶ 164; see also Pltf. Opp (Dkt. No. 47) at 42-43)

Plaintiff first cites a statement from an Amex spokesperson that is reported in a September 18, 2014 Bloomberg article:

---

underscore the plausibility and reasonableness of the false impression that Plaintiffs allege Defendants' statements conveyed," that finding was made in response to defendants' argument that no reasonable investor could have been misled by their statements, given other information available to investors. In re STEC Inc. Sec. Litig., 2011 WL 2669217, at *7-*8. Here, as discussed above, defendants' statements were clear on their face.

In United States v. Ferguson, 553 F. Supp. 2d 145, 154-55 (D. Conn. 2008), the court relied on analyst testimony in rejecting defendants' challenge to the materiality of alleged misstatements for which they had been convicted of securities fraud. Defendants did not challenge the fact that the statements were misleading, however. Ferguson, 553 F. Supp. 2d at 151-52 ("Defendants Ferguson and Garand assert that there is insufficient evidence to sustain their convictions for securities fraud, false statements to the SEC, and mail fraud because no rational jury could have found AIG's misstatements about its loss reserves to be material." (footnote omitted)).

Finally, in Schlesinger Investment Partnership v. Fluor Corp., 671 F.2d 739, 742 (2d Cir. 1982), the Second Circuit reversed that portion of the district court's decision which denied leave to amend following dismissal of the complaint. The district court had sua sponte dismissed the complaint for failure to state a claim without notice to the parties. Id. at 740-41. In discussing the unfairness of the sua sponte dismissal, the court noted that plaintiff had proffered on appeal that – had he known that the district court was contemplating dismissal – he would have offered evidence that both analysts and shareholders were misled by the challenged tender offer's language. Id. at 742. The court did not endorse the idea that an analyst's reaction alone can render an otherwise clear statement misleading, however. Moreover, this case was decided well before the passage of the PSLRA and the heightened plausibility standard set forth in Iqbal.

> The term[] of the contract was up, AmEx and Costco entered into negotiations and were unable to come to terms . . . . This is very specific and exclusive to Canada. There are separate contracts for AmEx's U.S. Costco relationship.

(Am. Cmplt. (Dkt. No. 38) ¶ 162 (emphasis omitted); see also Ascher Decl. (Dkt. No. 46-12), Ex. 12 at 1)

Plaintiff also cites Campbell's statement during the October 15, 2014 earnings call:

> I'll note that we have separate agreements with Costco in each of the several markets where we maintain a partnership, and have a longer and more significant relationship with Costco in the US, dating back over 15 years. As with any long-term partnership, we work with Costco on an ongoing basis to find ways to drive value for both parties going forward, never losing sight of the fact that we are serving the same customers.

(Am. Cmplt. (Dkt. No. 38) ¶¶ 92, 163 (emphasis omitted))

Defendants argue that these statements were factually accurate and are non-actionable historical statements. (Def. Br. (Dkt. No. 45) at 41-42) Plaintiff responds that these statements are actionable, forward-looking statements because, "[i]n effect, Defendants told investors not to worry about the loss of the Costco Canada Agreement, and that the risk of losing the Costco U.S. Agreement was low, because the two agreements were completely separate, and the AmEx-Costco relationship in the U.S. was longer and stronger." (Pltf. Opp. (Dkt. No. 47) at 42-43) Plaintiff contends that these statements became misleading when "the trajectory of the Costco U.S. Agreement [began] following that of the Costco Canada Agreement," and that accordingly Defendants had a duty to update these statements. (Id. at 43)

"The duty to correct applies when 'a company makes a historical statement that at the time made, the company believed to be true, but as revealed by subsequently discovered information actually was not.'" Kowal v. IBM (In re IBM Corporate Sec. Litig.), 163 F.3d 102, 109 (2d Cir. 1998) (quoting Stransky v. Cummins Engine Co., 51 F.3d 1329, 1331 (7th Cir.

1995)). It arises "if and when a speaker learns that a prior statement was misleading when made." Id. (emphasis added). Alternatively, "[a] duty to update may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event." Id. at 110. The duty to update is not without limits, however. The duty to update "does not extend to: (1) 'vague statements of optimism or expressions of opinion'; (2) statements that are 'not forward looking and do[] not contain some factual representation that remains "alive" in the minds of investors as a continuing representation'; or (3) statements that are not material." In re Sanofi-Aventis Sec. Litig., 774 F. Supp. 2d 549, 562 (S.D.N.Y. 2011) (quoting Kowal, 163 F.3d at 109).

In In re Time Warner, for example, the company "publicly hyped strategic alliances" as a way to raise capital, but was forced to change course to include a variable price offering when only two smaller-scale partnerships emerged. In re Time Warner, 9 F.3d at 262, 268. The court held that Time Warner was required to disclose those additional facts that would place its prior statements concerning strategic alliances in a different light. Id. at 268. Similarly, in In re Quintel Entertainment Inc. Securities Litigation, Quintel "publicly hyped its unique and exciting partnership with AT&T, as well as its success in decreasing chargebacks." 72 F. Supp. 2d 283, 292-93 (S.D.N.Y. 1999) (citation omitted). Later, however, it became clear that the "customer chargebacks had been understated." Id. at 291. Moreover, "AT&T [began] scaling back its partnership with Quintel." Id. Given these circumstances, the court concluded that "defendants should have made a corrective disclosure." Id.

Here, Defendants' statements are not subject to a duty to update. The Bloomberg quote concerns the outcome of unsuccessful negotiations regarding the Costco Canada Agreement, and states that Amex's agreements with Costco Canada and Costco U.S. are

"separate contracts." (Am. Cmplt. (Dkt. No. 38) ¶ 162) The challenged statements simply confirm that no direct link between the two contractual agreements exists. This statement of existing fact cannot be properly characterized as "hype" or "forward looking" projections regarding the continuation of the Amex-Costco U.S. relationship.

There was likewise no duty to update Campbell's statements made during the third quarter earnings call. Campbell's statement regarding the longevity and significance of the Costco U.S. agreement is a statement of existing fact. It does not contain forward-looking factual representations and did not require later correction or clarification. While Campbell's later remark that Amex is "work[ing] with Costco on an ongoing basis to find ways to drive value for both parties going forward" is arguably forward-looking, it nonetheless did not trigger a duty to update.

Unlike in Time Warner and Quintel, where the defendants "hyped" a part of their business plan as a solution to a problem or to justify a claim that the value of the company was increasing, Campbell did not "hype" the Costco U.S. Agreement. His statement that both companies would work together "to find ways to drive value" was nothing more than a generic statement of hopeful optimism about the future. Such statements do not project future behavior and "lack the sort of definite positive projections that might require later correction." Time Warner, 9 F.3d at 267; see also San Leandro Emergency Med. Group Profit Sharing Plan v. Phillip Morris Cos., 75 F.3d 801, 811 (2d. Cir. 1996) (no duty to update "subdued general comments" of optimism). In sum, there was no duty to update, because Campbell's statement was merely a "vague, forward-looking expression[] of optimism that "[was] not sufficiently concrete, specific or material to impose a duty to update." In re Quintel Entm't, 72 F. Supp. 2d at 292 (citation omitted).

**D. Whether Defendants Otherwise Had a Duty to Disclose Facts Concerning the Costco U.S. Agreement and Renewal Negotiations**

In the Amended Complaint's Third Cause of Action, Plaintiff claims that Defendants had a duty to disclose the following facts regarding the risk that the Costco U.S. Agreement would not be renewed: (1) that Amex had initiated early negotiations; (2) that Costco had solicited competing bids; and (3) that non-renewal of the Costco U.S. Agreement would have a material adverse "near-term financial impact." (Am. Cmplt. (Dkt. No. 38) ¶ 147)

"An omission is actionable under federal securities laws "only when the [defendant] is subject to a duty to disclose the omitted facts." City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 410 (S.D.N.Y. 2011) (quoting In re Time Warner, 9 F.3d at 267). "Such a duty may arise when there is 'a corporate insider trad[ing] on confidential information,' a 'statute or regulation requiring disclosure,' or a corporate statement that would otherwise be 'inaccurate, incomplete, or misleading.'" Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015) (quoting Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992). As noted earlier, "there is no duty to disclose a fact . . . 'merely because a reasonable investor would very much like to know that fact . . . .'" Meyer, 761 F.3d at 250 (quoting In re Time Warner., 9 F.3d at 267). "'Even if information is material, there is no liability under Rule 10b-5 unless there is a duty to disclose it.'" Glazer, 964 F.2d at 156 (quoting Backman v. Polaroid Corp., 910 F.2d 10 (1st Cir.1990)).

On this point, Plaintiff merely argues that Defendants' statements were misleading absent the missing information. (Pltf. Opp. (Dkt. No. 47) at 43-45) For reasons explained above, this Court has concluded that the statements cited by Plaintiff were not misleading. Accordingly, Defendants' statements did not give rise to a duty to disclose.

## II.    ALLEGED ITEM 303 OMISSIONS

In the Amended Complaint's First Cause of Action, Plaintiff claims that Defendants violated their duty to quantify and disclose the expected impact of known trends and uncertainties in Amex's business, as required by Item 303 of SEC Regulation S-K. Plaintiff complains that: (1) while Defendants disclosed the known trend of increased competition with respect to obtaining co-brand agreements in general, they did not quantify the expected impact of this trend on Amex's business; and (2) Defendants did not disclose the uncertainty regarding renewal of the Costco U.S. Agreement nor did they quantify and disclose the impact of non-renewal. (See Am. Cmplt. (Dkt. No. 38) ¶¶ 128-129)) Defendants contend that they adequately disclosed the general trend of increased competition in obtaining co-brand agreements, and that the possible non-renewal of the Costco U.S. Agreement in particular did not reach the threshold required for disclosure under Item 303. (Def. Br. (Dkt. No. 47) at 31)

### A.    Amex's Failure to Quantify the Effect of Negative General Trends

Plaintiff alleges that in Amex's Second Quarter 2014 10-Q, "Defendants disclosed a known trend of increased competition with respect to co-brand agreements in general, but Defendants failed to quantify and disclose the expected impact of that trend, as required by Item 303." (Am. Cmplt. (Dkt. No. 38) ¶¶ 14(a)(ii), 67-69, 128)

#### 1.    Legal Standard for Falsity/Duty to Disclose under Item 303

Item 303 of Regulation S-K requires that certain SEC-mandated filings "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). The SEC's 1989 Interpretive Release concerning Item 303 sets forth a two-part inquiry:

(1) Is the known trend [or uncertainty] . . . likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend [or uncertainty] . . . on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

Stratte-McClure, 776 F.3d at 103 (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18, 1989), 1989 WL 1092885, at *6 [hereinafter "1989 SEC Release"]).[8] Accordingly, unless management can "determine that [the known trend or uncertainty] is not reasonably likely to occur," disclosure is required. According to the SEC, the disclosure threshold "is lower than 'more likely than not.'" Commission Statement about Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 8056, Exchange Act Release No. 45321, FR-61, 2002 WL 77153 at *4 (Jan. 22, 2002) [hereinafter, "2002 SEC Release"]. Item 303 "requires the registrant's actual knowledge of the relevant trend or

---

[8] The Second Circuit has held that "Item 303 imposes the type of duty to speak that can, in appropriate cases, give rise to liability under Section 10(b)." Stratte-McClure, 776 F.3d at 102. To state a claim under this theory, "a plaintiff must first allege that the defendant failed to comply with Item 303 in a 10-Q or other filing. Such a showing establishes that the defendant had a duty to disclose." Id. at 104. Second, "[a] plaintiff must then allege that the omitted information was material under Basic[ v. Levinson]'s probability/magnitude test," which requires "a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." Id. at 102-04 (quoting Basic Inc. v. Levinson, 485 U.S. 224, 238 (1988)). Defendants note Stratte-McClure's requirement of Basic materiality for Section 10-b liability but do not appear to contest that the Costco U.S. Agreement satisfies Basic's test for materiality. (Def. Br. (Dkt. No. 45) at 30 n.8); cf. Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 713 (2d Cir. 2011) (noting that a "5% threshold [is] an appropriate 'starting place' or 'preliminary assumption' [for] immateriality").

uncertainty." Ind. Pub. Ret. Sys. v. SAIC, Inc., 818 F.3d 85, 95 (2d Cir. 2016), cert. granted sub

nom. Leidos, Inc. v. Ind. Pub. Ret. Sys., 137 S. Ct. 1395 (2017).

"Events that have already occurred or are anticipated often give rise to known

uncertainties." 1989 SEC Release, 1989 WL 1092885, at *5. One example of an uncertainty

required to be disclosed is the impending expiration of a material government contract.

> The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed. The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required.

Id. at *5.

## 2. **Analysis**

Plaintiff argues that quantitative information concerning the potential effect on

Amex of the trend of increased competition for co-brand agreements was "reasonably available"

to Defendants, given Amex's disclosures made twelve days after it announced that the Costco

U.S. Agreement would not be renewed. Accordingly, Plaintiff argues that this information

should have been disclosed under Item 303. (Pltf. Opp. (Dkt. No. 47) at 33-36) Defendants

contend that they were not required to disclose quantitative information about specific exposures,

and that quantitative information concerning the general trend was unknowable. (Def. Br. (Dkt.

No. 45) at 36-37)

"Item 303 requires disclosure of a known trend [or uncertainty] and the 'manner

in which' it 'might reasonably be expected to materially impact' a company's overall financial

position." Stratte-McClure, 776 F.3d at 105 (quoting Litwin v. Blackstone Grp., L.P., 634 F.3d

706, 718-19 (2d Cir. 2011)). However, "[t]he SEC has cautioned that this obligation requires 'quantitative information' only when it is "'reasonably available and will provide material information for investors.'" Id. (quoting Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results Of Operations, Exchange Act Release No. 33-8350, Securities Exchange Act Release No. 34-48960, FR-72, 68 Fed. Reg. at 75062, 75065, 2003 WL 22996757, at *11 (Dec. 19, 2003) [hereinafter, "2003 SEC Release"]).

In Stratte-McClure, the Second Circuit found that defendant Morgan Stanley "breached [its] Item 303 duty to disclose that [it] faced a deteriorating subprime mortgage market that, in light of the company's exposure to the market, was likely to cause trading losses that would materially affect the company's financial condition." Stratte-McClure, 776 F.3d at 104. While noting that the company was required to provide "'not only a "discussion" but also an "analysis" of known material trends,'" the court refused to interpret Item 303 in such a way as would require companies to "give competitors notice of proprietary strategies and information." Id. at 105 (quoting 2003 SEC Release, at *11) (citing San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 809 (2d Cir. 1996)). Instead, the court ruled that companies are not required "to announce [their] internal business strategies or to identify the particulars of [their] trading positions." Id. Applying that standard, the court concluded that Morgan Stanley was not required to disclose its $13 billion long position in the subprime mortgage market, but rather "only that it faced deteriorating real estate, credit, and subprime mortgage markets, that it had significant exposure to those markets, and that if the trends came to

fruition, the company faced trading losses that could materially affect its financial condition."

Id. at 105-06.[9]

While the 2003 SEC Release calls for the disclosure of quantitative information where such information is "reasonably available," Stratte-McClure evinces a concern for the disclosure of sensitive business information, including – in that case – specific positions and total exposure. Although Morgan Stanley knew that it could lose up to $13 billion, it was only required to disclose the fact that it faced exposure as the result of a specific trend in the mortgage market that could materially affect its financial condition.

Here, Amex's Second Quarter 2014 10-Q provided the following disclosure about increased competition in obtaining co-brand agreements:

> We also face substantial and increasingly intense competition for partner relationships, which could result in a loss or renegotiation of these arrangements that could have a material adverse impact on our business and results of operations.

---

[9] Contrary to Plaintiff's contention (see Pltf. Opp. (Dkt. No. 47) at 29-32), neither Litwin v. Blackstone Group nor Panther Partners Inc. v. Ikanos Commc'ns, Inc., 681 F.3d 114 (2d Cir. 2012), require disclosure of quantitative information. In Litwin, the Second Circuit rejected defendant Blackstone's argument that it had sufficiently disclosed information relating to two of its holdings even though some of the information was already public. Litwin, 634 F.3d at 718. The court found Blackstone's disclosures insufficient because Blackstone had not "disclose[d] the manner in which those then-known trends, events, or uncertainties might reasonably be expected to materially impact Blackstone's future revenues." Id. at 719.

In Panther Partners, the Second Circuit found that defendant's "generic cautionary language" – that their products frequently had bugs and defects – was insufficiently specific where there was a "particular, factually-based uncertaint[y] of which [defendant] was aware" – namely, a higher than average defect rate in a particular product. Panther Partners, 681 F.3d at 122.

In both of these cases, the court faulted defendants for not describing the "manner" in which the uncertainties might materially affect the company. Id. at 120 ("[A]t issue . . . is the manner in which uncertainty . . . might reasonably be expected to have a material impact on future revenues."); Litwin, 634 F.3d at 719 ("Blackstone was required to disclose the manner in which those then-known trends, events, or uncertainties might reasonably be expected to materially impact Blackstone's future revenues.").

. . . Competition for relationships with key business partners is very intense and there can be no assurance we will be able to grow or maintain these partner relationships. We face the risk that we could lose partner relationships, even after we have invested significant resources, time and expense in acquiring and developing the relationships, which could result in Card Member attrition or additional costs to retain Card Members. We also face the risk that existing relationships will be renegotiated with less favorable terms for us as competition for such relationships increases. The loss of business partners or the renegotiation of existing relationships with terms that are significantly worse for us could have a material adverse impact on our business and results of operations.

(Ascher Decl. (Dkt. No. 46-10), Ex. 10 (Second Quarter 2014 10-Q) at 9-10)

Item 303 requires no more. Amex described the trend: "[w]e also face substantial and increasingly intense competition for partner relationships." (Id.) Amex described how that negative trend could affect its business: "we could lose partner relationships," and "[w]e also face the risk that existing relationships will be renegotiated with less favorable terms for us." (Id.) And Amex described the consequences that could ensue if that came to pass: "loss or renegotiation of these arrangements . . . could have a material adverse impact on our business." (Id.) Given that Amex did not know (1) which agreements might not be renewed; (2) which agreements might be renewed on less favorable terms; or (3) for agreements that were renewed on less favorable terms, what the new terms and their financial impact might be, Amex could not precisely quantify potential effects on its business. The Court concludes that Amex's discussion and analysis of the negative trend regarding co-brand agreements was adequate under the circumstances. Amex thus met its disclosure obligation and did not omit required quantitative information.

### B. Whether Plaintiff Has Adequately Pled Scienter Regarding Amex's Failure to Disclose Information Concerning the Renewal of the Costco U.S. Agreement

Plaintiff relies on the following allegations in the Amended Complaint in arguing that it has adequately pled scienter: (1) the "los[s] [of] the Costco Canada Agreement to a lower-

priced competitor"; (2) Amex's initiation of early renewal negotiations for the Costco U.S.

Agreement, which resulted in "Costco open[ing] competitive bidding"; (3) Chenault's statement

that Amex "initiated these early negotiations with Costco understanding that it would have a

'near-term financial' impact on the Company"; (4) Costco's statements to the effect that Amex

was "'just another vendor,'" and that Costco would select the lowest-priced co-brand; (5)

Amex's "premium" business model meant "it was unable to compete on price"; and (6) the

significance to Amex of the Costco U.S. Agreement.[10] (Pltf. Opp. (Dkt. No. 47) at 46-48 (citing

Am. Cmplt. (Dkt. No. 38) ¶¶ 11, 34-36, 56-60, 73, 76))

 Defendants argue that these allegations do not support an inference of scienter

because Amex disclosed (1) the general negative trend of increased competition for co-brand

agreements; (2) the possible material consequences Amex could suffer as a result of this negative

trend; and (3) promptly when negotiations with Costco concerning renewal reached an impasse.

(Def. Br. (Dkt. No. 45) at 49-51; Def. Reply (Dkt. No. 48) at 8-12) Defendants also argue that

Amex believed that non-renewal was "not 'reasonably likely'" given (1) the fifteen-year

relationship between Costco and Amex in the United States, and (2) that Amex could be

competitive in terms of price, given its incumbency advantage. (Def. Br. (Dkt. No. 45) at 31-35)

Defendants contend that "the only plausible inference" from the loss of the Costco Canada

Agreement was that Amex would have to make pricing concessions in order to obtain renewal of

the Costco U.S. Agreement. (Id. at 31-32) Costco's statements to the effect that it would treat

---

[10] Plaintiff also argues that Amex's disclosures regarding the Delta Agreement demonstrate that
Defendants were aware of their obligation to make disclosures concerning the Costco U.S.
Agreement. As discussed above, however, Defendants' Delta disclosures were made at the
SEC's request, and reflected the peculiarities of the airline business. The Delta disclosures do
not suggest that Defendants knew that they had a disclosure obligation with respect to the
uncertainty of specific co-brand renewals.

Amex like any other vendor, and that Costco was focused on price, were interpreted by Amex as simply a bargaining ploy. (Id. at 32-33; see id. at 34 ("At its core, the Amended Complaint is trying impermissibly to plead 'fraud by hindsight.'" (citations omitted)))

### 1.    Legal Standard for Scienter Based on Omission

Rule 9(b) reflects a "relaxation" of the specificity requirement in pleading the scienter element of fraud claims, requiring that fraudulent intent need only be "alleged generally." See Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir. 1994); Fed. R. Civ. P. 9(b). The Second Circuit has made clear, however, that this "relaxation . . . 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'" Shields, 25 F.3d at 1128 (quoting O'Brien v. Nat'l Prop. Analysts Partners, 396 F.2d 674, 676 (2d Cir. 1991)). Accordingly, the Second Circuit has long required plaintiffs making securities fraud claims to "allege facts that give rise to a strong inference of fraudulent intent." Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000); see also Shields, 25 F.3d at 1128.

The PSLRA adopts the "strong inference" standard set by the Second Circuit, and provides that "where proof of scienter is a required element . . . a complaint must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Slayton v. Am. Exp. Co., 604 F.3d 758, 766 (2d Cir. 2010) (quoting 15 U.S.C. § 78u-4(b)(2)). "Under this heightened pleading standard for scienter, a 'complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" Slayton, 604 F.3d at 766 (quoting Tellabs, 551 U.S. at 324). "In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation, but the facts alleged must be 'taken collectively.'" Id.

"The 'strong inference' standard is met when the inference of fraud is at least as likely as any non-culpable explanations offered." Id. "The plaintiff may satisfy [the PSLRA's heightened pleading] requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." ATSI Commc'ns, Inc., 493 F.3d at 99 (citing Ganino, 228 F.3d at 168-69); see also Novak 216 F.3d at 311 ("[T]he inference may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor . . . ." (citations omitted)).[11]

Under a "conscious misbehavior or recklessness" theory of scienter, absent intentional misconduct, Plaintiff "'must show 'conscious recklessness – i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." Stratte-McClure, 776 F.3d at 106 (quoting S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009) (quoting Novak, 216 F.3d at 312)) (emphasis omitted by Stratte-McClure).

Where the alleged conduct is an omission, "conscious recklessness" means defendants must have "acted with at least a reckless disregard of a known or obvious duty to disclose." SAIC, 818 F.3d at 96; see also In re Bank of Am. AIG Disclosure Sec. Litig., 980 F. Supp. 2d 564, 585-86 (S.D.N.Y. 2013) ("'Reckless conduct is, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the

---

[11] Plaintiff does not assert a "motive and opportunity" theory here. (See Pltf. Opp. (Dkt. No. 47) at 52-53)

defendant must have been aware of it.'" (quoting Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996))), aff'd, 566 F. App'x 93 (2d Cir. 2014).

In SAIC, defendants were accused of failing to disclose fraud committed by employees in connection with a contract with the City of New York. SAIC, 818 F.3d at 88. By late 2010, Defendants had removed one of its employees on the project who had committed fraud, and hired a law firm to conduct an internal investigation. Id. at 89. By the time defendants filed their March 2011 Form 10-K, they knew (1) the results of the internal investigation; (2) that the City and New York State had rejected other potential contract awards to defendants because of the fraud; and (3) that prosecutors were investigating the fraud. Id. at 93-96. The company did not disclose the fraud, however, until prosecutors did so in June 2011. Id. at 97. Given these facts, the court found an inference of scienter because defendants had a duty to disclose the fraud and were reckless in not doing so. Id. at 96-97.

An omission may also be reckless where a company is aware that an important contract has been terminated or repudiated, even where the company believes that there is no legal basis for the termination or repudiation. In In re Hi-Crush Partners L.P. Sec. Litig., No. 12 CIV. 8557 CM, 2013 WL 6233561, at *1 (S.D.N.Y. Dec. 2, 2013), for example, defendant had signed a five-year supply contract with a large customer that included a confidentiality provision allowing for disclosure of the contract "as may be required by law." Hi-Crush Partners, 2013 WL 6233561, at *1. In preparation for its initial public offering, Hi-Crush was required to disclose the contract. After disclosure, the customer sent a letter accusing Hi-Crush of breach and repudiating the contract. Id. at *2-*3. Shortly thereafter, Hi-Crush posted an investor presentation on its website that "hyped" the supply contract, and did not disclose the repudiation. Id. at *3. The court held that the customer's repudiation of the contract – even if contested by

Hi-Crush – meant that the relationship was "obvious[ly]" in jeopardy, and ran directly contrary to Hi-Crush's website presentation, which had emphasized Hi-Crush's stable, long-term contracts. Id. at *23. As a result, defendant had a "clear duty to disclose" and was reckless in not doing so. Id.

### 2. **Analysis**

Here, the essence of Plaintiff's argument is that not only was renewal uncertain, but that the alleged facts made renewal so uncertain that Defendants would have been "consciously reckless" in not having realized that non-renewal was "reasonably likely."

The non-renewal of the Costco Canada Agreement; Amex's decision to initiate early negotiations; Amex's handicap in competing on price; Costco's statements that Amex was "just another vendor" and solicitation of competing bids;[12] and the overall increased competition for co-brand agreements all raised questions about the likelihood of renewal. But Plaintiff's allegations must raise a "strong inference" both that it was "obvious" that non-renewal was "'reasonably likely to occur,'" and that Defendants had actual knowledge of that probability. SAIC, 818 F.3d at 96; Stratte-McClure, 776 F.3d at 103 (quoting 1989 SEC Release, 1989 WL 1092885, at *6).

The Amended Complaint does not meet this standard.

Having lost the Costco Canada contract, Defendants were in a position to know what might be required to obtain renewal of the Costco U.S. Agreement. Knowing that, they

---

[12] The Amended Complaint does not plead facts demonstrating that Defendants were aware that Costco had solicited competing bids. (See Am. Cmplt. (Dkt. No. 38) ¶ 129 (alleging "Defendants knew . . . that Costco had solicited competing bids from other parties" but providing no supporting facts); see also ¶¶ 14(a)(ii), 67, 70, 84, 89, 93, 147, 164 (alleging that Amex's initiation of early negotiations spurred Costco to solicit competing bids but not alleging that Defendants knew that Costco had taken this action)

decided to open negotiations for renewal, and they did so ahead of schedule in order to leverage their incumbency advantage. Amex had previously used this tactic successfully in connection with the Delta Agreement. (See Am. Cmplt. (Dkt. No. 38) ¶ 86 (noting that Amex had recently renewed the Delta Agreement ahead of schedule)) Although Plaintiff argues that Defendants believed that non-renewal was reasonably likely to occur, Plaintiff has not explained why – believing that – Defendants would have sought to open renewal negotiations ahead of schedule.

Although the Amended Complaint pleads that Costco had stated that it would treat Amex like "any other vendor" and would select the "cheapest" option among competing bids, Amex interpreted these statements as evidence that Costco would drive a hard bargain, not that Costco would ignore the parties' fifteen-year relationship. Plaintiff has not shown that Defendants' interpretation of Costco's remarks was unreasonable under the circumstances, or that Defendants had reason to believe that it was unreasonable.

That this is the more cogent and compelling interpretation of the facts is buttressed by Defendants' disclosure of the non-renewal on February 12, 2015. While Plaintiff argues that Defendants' behavior is similar to that seen in SAIC and Hi-Crush Partners, (Pltf. Opp. (Dkt. No. 47) at 51), the dissimilarity between the facts here and the facts in those cases undermines Plaintiff's scienter argument. In SAIC, defendant waited until prosecutors announced the fraud before making any disclosure on its own. SAIC, 818 F.3d at 89-90. And in Hi-Crush, defendant knew that a critical contract had been repudiated, but touted the contract on its website. Hi-Crush Partners, 2013 WL 6233561, at *3. Here, there is no allegation that Amex delayed a public announcement once its negotiations with Costco had reached an impasse.[13]

---

[13] Stratte-McClure, cited by Plaintiff (Pltf. Opp. (Dkt. No. 47) at 50-51), is not to the contrary. In concluding that plaintiff had not adequately pled scienter, the court noted that the complaint

Finally, Plaintiff argues that Chenault's statement about "near-term financial impact" – made when the non-renewal was announced – demonstrate that Defendants knew or should have known that disclosure was necessary. (Pltf. Opp. (Dkt. No. 47) at 48) The statement cited by Plaintiff reads as follows:

> In evaluating our co-brand relationships in this broader context, we decided to accelerate contract renewal discussions with several co-brand partners well in advance of their expiration dates. Our goal has been to reach multi-year renewals of those partnerships that could offer the best value for our card members, the best potential for growth and the best economics for our shareholders. We took this step knowing that it could have a near-term financial impact but also knowing that it would provide clarity about the lineup of partners and programs we would focus on going forward.

Ascher Decl. (Dkt. No. 46-4), Ex. 4 (Feb. 12, 2015 Call) at 4 (emphasis added)) Chenault's statement reflects no more than an awareness of the possibility that co-brand agreements might not be renewed, and an acknowledgement that the loss of a co-brand relationship might have a "near-term financial impact." But Amex made precisely that disclosure in its public filings. (Ascher Decl. (Dkt No. 46-10), Ex. 10 at 9 (Second Quarter 2014 Form 10-Q); id. (Dkt. No. 46-8), Ex. 8 at 21 (2012 Form 10-K).

Accepting Plaintiff's factual allegations as true, and assuming arguendo that the non-renewal of the Costco U.S. Agreement was "reasonably likely" prior to February 12, 2015, Plaintiff's allegations are nonetheless insufficient to present an inference of "conscious recklessness" "'approximating actual intent'" that is "at least as cogent and compelling" as Defendants' explanation that they believed that ultimately non-renewal was "not 'reasonably likely'" to transpire.

---

"is silent about when employees realized that the more pessimistic assessments of the market were likely to come to fruition." Stratte-McClure, 776 F.3d at 107. Here, Plaintiff has not pled facts demonstrating that Defendants realized – prior to the announcement of the impasse – that non-renewal of the U.S. Costco Agreement was reasonably likely to occur.

## III.    SECTION 20(A) OF THE EXCHANGE ACT

Plaintiff also brings a claim against Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).  A claim for control person liability under Section 20(a) is "necessarily predicated on a primary violation of the securities laws." Rombach, 355 F.3d at 177-78.  Because the Court finds that Plaintiff has not adequately plead any underlying violation of the securities laws, this claim will likewise be dismissed.  See id.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is granted.  The Clerk of the Court is directed to terminate the motion (Dkt. No. 44).

Plaintiffs have requested leave to amend in the event that this Court dismisses all or part of the Amended Complaint.  (Pltf. Opp. (Dkt. No. 47) at 53).  "[I]t is often appropriate for a district court, when granting a motion to dismiss for failure to state a claim, to give the plaintiff leave to file an amended complaint." Van Buskirk v. N.Y. Times Co., 325 F.3d 87, 91 (2d Cir. 2003) (citing Branum v. Clark, 927 F.2d 698, 705 (2d Cir. 1991)).  "Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." Jin v. Metro. Life Ins. Co., 310 F.3d 84, 101 (2d Cir. 2002).

Here, Defendants have not pointed to any reason why leave to amend should be denied.  Accordingly, Plaintiffs will be granted leave to amend.  Any Second Amended Complaint will be filed by **October 26, 2017**.

Dated:  New York, New York             SO ORDERED.
       September 30, 2017

                                       Paul G. Gardephe
                                       United States District Judge